CRESCENT PLANING MILL COMPANY, PLAINTIFF, RESPONDENT, v. JULIUS MUELLER ET AL., DEFENDANTS, APPELLANTS.—123 S. W. (2d) 193.

St. Louis Court of Appeals.   Opinion filed January 3, 1939.

*Grimm, Mueller & Roberts* and *Paul Dillon* for appellants.

1244

*Sullivan, Reeder & Finley* for respondent.

BENNICK, C.—This is a suit for an injunction to restrain defendants, who are the officers, agents, and members of the local District Council of the United Brotherhood of Carpenters and Joiners of America, from making effectual an alleged boycott of the products of plaintiff, Crescent Planing Mill Company, which has its mill or plant at 3237 North Ninth Street in the City of St. Louis, and is engaged in the manufacture and sale, in the metropolitan area of said city, of millwork and cabinet-work made use of primarily in the erection of buildings.

· The District Council, which is composed of delegates selected by and from the membership it serves and represents, is the governing body for the local branches of the union, which is made up of skilled workers employed both in the milling and manufacture, and in the erection and installation, of the types of wood products over which the union claims and asserts jurisdiction.

It appears that plaintiff, Crescent Planing Mill Company, is one of about twenty mills in the St. Louis territory which have always operated on the basis of open shop, by which is meant that their employees are hired without regard to their union affiliations and without discrimination being made as between those who do and those who do not belong to the union. Indeed in plaintiff's own case all but two of its twenty-five employees were either members of the union or else had become so by the time of the trial below, though for want of an agreement with the union obligating it to do so, plaintiff did not pay the union wage scale (a minimum of sixty-five cents an hour), nor did it operate its mill according to union regulations and trade rules.

It was shown that general contractors and builders constituted the principal customers of the mill companies such as plaintiff, and that the products of the mills were customarily sold by means of competitive bidding on the part of all the companies in response to specifications submitted by the contractor who was about to undertake a particular job. It was also shown that labor cost was usually figured at about forty per cent of the total cost of the finished product, with the necessary result that nonunion mills, which paid their employees (as plaintiff did) an average wage of forty or forty-five

cents an hour, enjoyed a distinct advantage in such competitive bidding over the union mills operating in the same territory, which, by reason of their contracts with the union, were obliged to pay their employees the minimum union wage of sixty-five cents an hour.

Shortly after the NRA went into effect the union set about to remedy this situation which obviously reacted to the great disadvantage of its members who were employed in union mills, and along in 1935 entered upon a somewhat active, but entirely peaceable, campaign to unionize those mills which were operating on the basis of open shop. An initial step in the campaign was that of inducing the non-union employees of such mills to become members of the union, and to that end the District Council had agents stationed at the entrances to plaintiff's plant (and presumably at the entrances to the plants of the other open shop mills), who handed out dodgers or handbills to the employees inviting them to attend meetings of the union which were advertised as being open to persons not members of the organization.

Contemporaneously with the efforts being made towards inducing all the employees of the open shop mills to come into the organization, and as a further step towards bringing about the unionization of all the mills, the District Council, in June, 1935, promulgated a trade rule, theretofore regularly adopted by a majority of the votes of all the members in the district, that effective January 1, 1936, the members of the union engaged in the building and construction part of the industry would not thereafter handle or erect millwork that did not bear the union label of their brotherhood indicative of the fact that such millwork had been manufactured by members of the brotherhood. Incidentally such trade rule merely supplemented a similar rule of many years' standing which forbade members of the union employed in the building and construction part of the industry to handle and erect cabinet work that did not bear the union label; due notice of the extension of the rule to millwork was promptly given both to contractors employing union labor and to mill owners engaged in the manufacture of products to be affected by the rule.

Subsequent to January 1, 1936, the District Council began the enforcement of the rule, at least with respect to millwork purchased after its effective date; and a few instances were shown where contractors who employed union carpenters and had bought their millwork from plaintiff had their operations temporarily interfered with by representatives of the union refusing to permit such union carpenters to handle or erect the materials, not because the same had been purchased from plaintiff as a particular mill regardless as unfair to organized labor, but solely because of the absence of the union label on the materials. It was disclosed, however, that no general strike would be called by the union when permission would be refused union carpenters to handle or erect millwork not bearing the

union label; and if it happened, as it sometimes did, that enforcement of the rule made it necessary that all further progress with the work be stopped for the time being, it was only so because the nature of the job was such that no further steps could be taken towards completion of the project until after the millwork had been installed. Nevertheless it would seem that in every instance where enforcement of the rule was attempted, the contractors were finally permitted to carry on their jobs without further interference from the union upon their agreement with its representatives, usually verbal in character, that in the future they would purchase no millwork not bearing the union label as contemplated by the rule in question.

It was the action of the representatives of the union in promulgating and enforcing such trade rule which constituted the basis of plaintiff's charge of boycott, the evidence disclosing that prior to the time when enforcement of the rule was begun by the union, seventy-five per cent of plaintiff's millwork had been handled by union builders and contractors, who were in practical effect prevented by the rule from thereafter handling plaintiff's products unless it should see fit to enter into a working agreement with the union so that its products might bear the union label.

It appears that from the very beginning of the union's campaign in 1934 to unionize the open shop mills, representatives of the union had called upon plaintiff's managing officers from time to time in an effort to persuade them to enter into a working agreement with the union. The union representatives and the company officials had for the most part been acquainted with one another for many years, and while all the negotiations towards the unionization of plaintiff's plant were unsuccessful, they were at least conducted in amicable fashion.

Finally, in March, 1936, at the height of the campaign for the enforcement of the new trade rule, the union representatives renewed their efforts to have plaintiff agree to union regulations and submitted a written contract embodying the terms proposed. Plaintiff's officers, after taking time to consider the union's proposal, flatly declined to enter into the agreement, and as a result the employees went out on a strike which continued for about a week until a number of the employees, including some who were members of the union, returned to work for the company at the insistence of its officials. During the period of the strike pickets were stationed outside the plant who conducted themselves peaceably in all respects, and it is a conceded fact that no attempt was made at violence. As an aftermath of the strike, and following immediately upon its heels, this suit was instituted by plaintiff for an injunction against defendants, and upon the court's issuance of a temporary restraining order all picketing ceased, with the settlement of the controversy between plaintiff and the union left to abide the final determination of the case.

1248

Issue was joined upon the question of whether, in the light of such facts, defendants were guilty of having conspired together to bring about a boycott of plaintiff's products on the part of its customers, and after hearing the case upon the evidence adduced, the court entered a decree in favor of plaintiff, awarding it a permanent injunction in the following terms:

"Wherefore, it is ordered, adjudged and decreed by the Court that the defendants, and each of them, and their associates, and the named defendants, as officers of the Carpenters' District Council of the United Brotherhood of Carpenters and Joiners of America, and their successors in office, and all other persons to whom notice hereof shall come, be enjoined and restrained from boycotting or making effectual, promulgating, or in anywise proclaiming any boycott upon or against the plaintiff, its goods and business, and from sending, conveying, or delivering, in any way, to any person, firm, corporation, or association, any boycott notice, verbal or otherwise, upon or against the plaintiff, its materials, goods, and business, and from in any way menacing, hindering, or obstructing the plaintiff by interfering with its business, patronage, or customers, or from in any way impending the plaintiff from the fullest enjoyment of all the business, patronage, and custom which it may possess, enjoy, or acquire, and from interfering with the plaintiff or its business by threats to any persons who might be or become customers of the plaintiff, by advising them that the members of the United Brotherhood of Carpenters and Joiners of America, of the City and County of St. Louis and vicinity, or the constituent local unions thereof, would refuse to handle and use goods or materials manufactured, sold, or furnished by the plaintiff, and from causing or procuring, by any order, direction, request, or command, any person or persons, whomsoever, to decline to accept employment from or cease employment by any person, firm, or corporation, because of the fact that such person, firm, or corporation has been or is about to be, or contemplates becoming a customer of the plaintiff."

From the decree so entered defendants were allowed an appeal to the Supreme Court, presumably upon the theory that there was a constitutional question in the case and that the amount in dispute brought the case within the pecuniary limits of that court's jurisdiction. The Supreme Court found, however, that on the record in the case it had no jurisdiction, and consequently ordered that the cause be transferred here. [Crescent Planing Mill Co. v. Mueller (Mo.), 117 S. W. (2d) 247.]

Defendants urge as a matter of chief insistence that under the evidence adduced, the greater part of which was undisputed, the court erred in finding them guilty of a conspiracy to boycott plaintiff's products, and in enjoining them from the enforcement, as against the customers of plaintiff, of the trade rule prohibiting union carpenters

from handling or erecting millwork and cabinet work not bearing the union label.

Our Supreme Court has said in Lohse Patent Door Co. v. Fuelle, 215 Mo. 421, 114 S. W. 997, that "a boycott may be defined to be a combination of several persons to cause a loss to a third person by causing others against their will to withdraw him their beneficial business intercourse .through threats that, unless a compliance with their demands be made, the persons forming the combination will cause loss or injury to him."

Under such definition, which conforms substantially with all approved definitions of secondary boycott, we cannot escape the conclusion that no case was made entitling plaintiff to injunctive relief.

Keeping before us the thought that a boycott implies a combination of several persons "to cause a loss to a third person," it is at once apparent, we think, that plaintiff's case fails for want of proof of such essential element of the case, that is, the malicious object and purpose on defendants' part to cause injury to plaintiff as a concern with which the union had a personal grievance separate and apart from its controversy with all the open shop mills regarding the making of working agreements with the union.

From all the evidence adduced it is clear that defendants' enforcement of the trade rule in question was neither inspired by malice towards plaintiff, nor was it primarily designed to inflict injury on plaintiff or any other company affected by the provisions, but instead it was promulgated for the prime purpose of securing better terms and conditions of employment for members of the union whether employed by plaintiff or by any other person or concern engaged in any part of the industry over which the union claims jurisdiction. In other words, the purpose of the union in promulgating and enforcing the rule was to benefit its members and not to harm plaintiff or any other mill owner; and if plaintiff was harmed by the rule, as we have no doubt it was, it was only so because harm to plaintiff was unavoidable if the union was to accomplish its primary purpose of benefiting itself.

Indeed the action of the union in enforcing its rule was aimed at nonunion millwork and cabinetwork as such, wherever or by whom manufactured, and was not in anywise specifically directed at plaintiff, with those officials defendants had always maintained amicable relations. It was not the purpose of the union to coerce contractors and builders into withholding their patronage from plaintiff so that plaintiff, as a particular manufacturer, would be injured, but it was instead the purpose to induce such contractors and builders to purchase only union made millwork and cabinetwork from whatever manufacturer it might come, so that members of the union employed in the manufacture of such types of wood products would be thereby benefited by the higher wages and shorter hours that union regula-

tions would require. Union carpenters were not refused permission to handle the products on the job because they had been purchased from plaintiff, but only because they did not bear the union label. Any products of plaintiff bearing the union label would undoubtedly be handled and erected by union carpenters without question or objection; and so for want of proof of a malicious intent to injure plaintiff, and with threats, intimidation, and violence absent from the case, we think that defendant are not to be restrained from the enforcement of the rule which was only adopted by the members of the union for purposes deemed beneficial to themselves. [Bossert v. Dhury, 221 N. Y. 342, 117 N. E. 582; J. F. Parkinson Co. v. Building Trades Council, 154 Cal. 581, 98 Pac. 1027; Pierce v. Stablemen's Union, 156 Cal. 70, 103 Pac. 324.]

In support of its right to an injunction plaintiff has relied very largely (as also did the court below) upon the decision of the Supreme Court in Lohse Patent Door Co. v. Fuelle, *supra,* which likewise was a case in which the plaintiff, a concern engaged locally in the planing mill business, sought a decree enjoining the defendants, the then officers of the District Council of the United Brotherhood of Carpenters and Joiners of America, from declaring and prosecuting a boycott against the plaintiff and its business.

We think that the marked difference in the facts and situations of this and the Lohse case prevent the latter from being decisive as to the result to be reached in the decision of the case at bar.

It will be observed that in the Lohse case the trial court had sustained a demurrer to the petition, so that the appeal was by the plaintiff from the final judgment entered for the defendants upon the plaintiff's refusal to plead further. Consequently the point for decision by the Supreme Court was not whether the plaintiff was ultimately entitled to an injunction against the defendants, but instead was whether a cause of action for injunctive relief had been stated on the face of the petition.

The Supreme Court itself (on page 445 of the State report) summed up the petition in that case as having charged the defendants and those with whom they were affiliated with having entered into a "conspiracy" or an "unlawful" combination to injure and damage the "plaintiff's" business by having "coerced" and "intimidated" certain contractors and builders from purchasing and using all building materials manufactured by "it," that is, the plaintiff, by prohibiting their members from working upon all buildings in which "plaintiff's" materials were being used.

As the Supreme Court expressly pointed out, the demurrer filed by the defendants had admitted all the allegations of the petition to be true for the purposes of the demurrer, and upon such basis the court very properly held that a cause of action had been stated which would entitle the plaintiff to injunctive relief if it should succeed at

the trial of the case in sustaining the allegations contained in the petition.

However in the instant case we have no such state of facts in the evidence adduced as were pleaded on the face of the petition filed in the Lohse case, but instead we have a case where defendants, without being inspired or motivated by malice towards plaintiff, and without intimidation or threats of violence to plaintiff's customers, have simply promulgated a rule prohibiting members of the union from handling and erecting millwork and cabinetwork not bearing the union label, which rule was in no sense specifically directed at the person of plaintiff or any other mill owner as an individual manufacturer of wood products, but instead was directed at the thing which was not to be handled or erected, that is, nonunion millwork and cabinetwork generally, regardless of where or by whom it may have been manufactured. Furthermore, as we have already pointed out, the rule was primarily designed to benefit members of the union and not to injure plaintiff's business except to the extent that injury might unavoidably follow from the enforcement of the rule; and so far as this record discloses union carpenters would not have the least objection to handling and erecting plaintiff's millwork and cabinetwork provided an agreement were entered into so that it might bear the union label.

For the reasons stated the judgment of the circuit court awarding plaintiff a permanent injunction against defendants should be reversed and the cause remanded with directions to the circuit court to enter up a new judgment in favor of defendants, dismissing plaintiff's petition. The Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. The judgment of the circuit court is, accordingly, reversed and the cause remanded in accordance with the recommendations of the Commissioner. *Hostetter, P. J.,* and *Becker* and *McCullen, JJ.,* concur.