Steve Rogers v. C. A. Poteet, R. O. Jackson, Harry Wright, Steve Mitchell and Claude McGlade, Appellants.—No. 39682.—199 S. W. (2d) 378.

Court en Banc, February 10, 1947.

*Joseph N. Miniace* and *Marcy K. Brown, Jr.*, for appellants.

*Gage, Hillix, Shrader, Cowherd & Phelps* for respondent.

 ELLISON, J.—This injunction suit is here on an appeal by five of the seven defendants from a decree of the circuit court of Jackson County, dated May 2, 1945, perpetually enjoining them from hindering, interfering with or preventing in any respect whatsoever, the receipt, unloading and processing of any milk brought to the Borden Dairy Company in Kansas City, Jackson County, Missouri by the plaintiff-respondent, Steve Rogers, his agents, employees or representatives. The other two defendants were discharged below.

The defendants-appellants are members of a labor union which has unionized the Borden Dairy Company plant (and others) in Kansas City. Pursuant to a union plan the appellants refused to unload milk delivered to that plant by respondent Rogers for himself and others, because he was not a member of their union. He thereupon brought this suit on the theory that appellants were violating our conspiracy statute, Sec. 8301;[1] and that he was an independent contract hauler of the milk and not subject to being unionized. Appellants challenge the sufficiency of the petition, evidence, and decree. They deny that they are conspirators; and contend respondent Rogers is not an independent contractor, but works under the control of the Pure Milk Producers Association of Greater Kansas City, hereinafter called the Producers Association, a non-profit co-operative corporation organized under Sec. 14335 et seq.; and that a bona fide labor dispute exists. Both parties invoke constitutional law.

The union to which appellants belong is Milk Drivers & Dairy Employees Local Union No. 207, hereinafter called the Union or the local Union. It is chartered by the Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, an international union affiliated with the American Federation of Labor. All classes of dairy employees, inside and outside, and all workers employed in the manufacture and distribution of milk and dairy products, are within the jurisdiction of the Brotherhood. The local union was

[1] All references to our statutes are to R. S. 1939, and the same section number in Mo. R. S. A.

chartered with jurisdiction over all persons so engaged in Jackson County, Missouri, and adjacent territory in Missouri and Kansas. It is a horizontal, closed shop union, and has organized all non-supervisory employees of the seven milk processing plants in Jackson County, including the Borden Dairy Company and the Aines Dairy, and of three plants across the State line in Kansas. The Borden Dairy Company maintains some milk routes of its own in Kansas City, as we understand. In all, the Union has 1000 or 1100 members. It is now attempting to bring into the Union the rural milk haulers who transport fresh fluid milk to these plants from the producing area around Kansas City.

The size of the area is not clear. At the times here involved there were 55 haulers therein, of whom 15 or 20 worked out of Kansas; and 42 of them had joined the Union. The towns mentioned by the five non-union haulers who testified, or named in the signed Union membership blanks offered in evidence, show the milk hauling was done in the following seven Missouri counties: Caldwell, Cass, Clay, Clinton, Henry, Jackson and Johnson. They have a total area of 4127 square miles. There are three other counties equally close to Kansas City, but not mentioned: Lafayette, Platte and Ray. Their total area is 1622 square miles. Geographically, the whole area may include well over 5000 square miles, omitting all territory in Kansas. As to the number of milk producers served by these routes in the whole area, the evidence also lacks clearness. Of the five routes operated by the five haulers who were witnesses, the total number of farmer producers was 164, and the total daily haulage of four of them was about 31,000 pounds—the fifth witness was not interrogated on the latter point. This makes an average of 33 producers per hauler, and an average daily production of 7750 pounds of milk per producer.

Each contract milk hauler has an established route over which he transports the fresh milk in cans to a particular processing plant daily including Sunday, and sometimes twice a day depending on the season. The hauler does this work personally, or by hired truckers or both. The hired truckers are included in the 55 haulers mentioned in the last paragraph. The haulers own their own trucks and are paid stipulated prices per 100 pounds of milk hauled depending on the distance and other factors. All those who testified had permits from the Office of Defense Transportation authorizing them to operate over their respective routes; and the respondent had a certificate of necessity and convenience from the Public Service Commission of Missouri. The amounts due the hauler are paid to him direct by the processing plant and deducted from the several balances of the producers on the route. The haulers own their milk routes, much as a newsboy owns his paper route, and they can buy and sell them, subject to certain limitations. Their contracts are sometimes written and sometimes oral or implied. They are made with the producers on

the route, but more often with a committee of those producers.

The milk producers are dairy or general farmers owning or renting their own land, and owning their cattle and milk producing equipment. Sometimes a producer also owns a milk route and transports his own production and that of other farmers. That was true of the respondent Rogers and two others of the five non-union haulers who were witnesses. The other two were solely contract haulers.

Essentially the purpose of corporations like the Producers Association, under Sec. 14336 is to promote co-operative marketing, processing and storing of agricultural products, including milk, and to purchase or hire machinery or equipment to be used by their members, who, under Sec. 14335, must be engaged in the production of agricultural products to be eligible. Most, but not all, of the producers on the milk routes heretofore mentioned belong to the Association. The respondent Rogers is vice president thereof. The Association has a standard form of membership agreement. Sec's 6 and 8 of which provide as follows:

Sec. 6. "The Member . . . hereby agrees that the Board of Directors of the Association may prescribe rules and regulations relative to the production, handling, testing, delivering, hauling, hauling zones and charges for services of others in the marketing of milk or dairy products produced by Member and other members, and the member agrees to be bound by and comply with the rules and regulations." (Then follow provisions about marketing and pooling milk, equalizing costs or prices and providing price incentives.)

Sec. 8. "The member agrees that if at any time while this agreement is in force he neglects or refuses to deliver said milk or dairy products to such person or persons, and at such place or places, and in such manner as may be designated from time to time by the Association"— he shall pay as liquidated damages 20% of the gross sale of the milk or dairy products diverted.

E. P. Mulligan, a Jackson County farmer who was president of the association, said it had about 1200 members; and that as a sales and service organization it receives a commission on the milk marketed by its producers, which is deducted by the processing plant from their balances and remitted to the Association, the same as is done with the haulers. He conceded that the membership agreement above mentioned was broad enough to permit the Association to make rules and regulations governing the hauling of the milk and the "zones" covered by each route; and also that the Association could designate the destination of the milk.

But he said that the matter of contracting with route haulers was left to the producers on the route or a committee thereof; that the destinations of the long established routes had been set up before the Association entered the Kansas City market, and it had not attempted to change them; that there were a few non-members of the Associa-

tion on some of the routes, especially the newer ones; that these producers had a perfect right to participate in the selection of the hauler; that sometimes the producers on a route at the expiration of the hauler's contract had called for bids which resulted in a change of the hauler; and that if a man living on a route had a market on that particular route, he continued to consign to it though the main destination of the milk was elsewhere.

Of the five haulers who testified, two had oral contracts and three had written contracts with a committee of the producers on the route. One said he had to get the approval of the Association before he could buy his route. None of these contracts was with the Producers Association itself. One of the contracts was on a form which had been originally prepared in its office, but witness Mulligan said very few of them were in use. It was drawn to be signed by a committee of the producers who were members of the Association living on the route, and described the hauler as "an independently established contract hauler and commercial truck and transport haul*ing*." It required the hauler to haul to such dairy plant as the producers *or* the Association might designate; to conform to the rules and regulations of the Association; and to indemnify it against liability or damage growing out of his operations. The contract stated it was to be construed as subject to the individual contracts of the member producers with the Association.

The appellants proved by cross-examination of the respondent Rogers, and by Mr. Mulligan, president of the Producers Association, whom they called as their own witness, that on April 11, 1945, while they were attempting to organize the rural milk haulers, Mulligan addressed a mimeographed letter to the members of the Association with an enclosed questionnaire sent out by the National Milk Producers Federation. The letter referred to "the threat of a general attempt to put farmers under labor organizations"; and to the attempt in the Kansas City area on the part "of union labor and some of the truck owners hauling milk to organize and compel all milk haulers to join the so-called union". He said he was "very fearful should they succeed that producers would have little if any say as to the manner of delivery of their milk to truckers or milk plants, or the price they will have to pay for hauling."

The letter went on to say: "The Association has always conceded labor union the right to organize the employees of truck owners hauling milk. Truck owners hauling milk for so much per hundredweight are independent contractors and not employees eligible to union membership. The Association considers unlawful any combination between truck owners and union plant employees and route men, and will oppose it as harmful to the interest of milk producers."

The questionnaire was partly in display type, and propounded questions which probably would elicit answers opposing union organi-

zation of workers in country plants and farm hands. It stated there are 13,000,000 union labor members and 6,000,000 farmers; and asked if the reader believed farmers would get sympathetic consideration in an organization in which city labor had such a large majority; whether farmers might be forced to join labor unions by threats of refusal to handle their milk; and how price levels of agricultural products would be affected. The board of directors of the Association called several meetings of its members over its territory at which these questions were discussed, and opposition to unionization of farm workers was expressed. The query was put whether milk producers would be willing to market their milk on union trucks, if the truckers were organized.

Returning to the evidence concerning appellants' acts. Mr. R. O. Jackson, secretary of the Union testified that early in 1945, after the employees of the milk plants had been organized, seven or eight of the rural haulers notified him that they wanted to join. In March he had a conference with Mr. Mulligan, president of the Producers Association and attempted to negotiate a contract which would bring into the Union the haulers of milk produced by that association. He failed, and on April 5 called a meeting of all the haulers for April 12, 1945, by mimeographed letters which were personally delivered to them by the assistant business agent, appellant Wright. The letters notified them the meeting would be the last at which they could join for $5, the initiation fee thereafter to be raised (to $25); and stated that at the meeting "the date will be set when the members of Local #207 will refuse to unload any milk hauler who is not a member of Local #207."

After that letter was delivered two haulers joined the Union and on the date of the meeting eleven more joined, as shown by the membership applications. An organization campaign was unanimously agreed upon, but only two more haulers ever came in. On April 19, the full executive board of the Union by unanimous vote authorized appellant Jackson to notify all men receiving milk at the seven plants: "to receive no milk or dairy products from any man driving a truck who is not a member of Local #207. In order not to inconvenience the public, just stop any two men at this time, pending an anticipated and threatened court case." The minutes recited further that: "Bros. Jackson was ordered to call a special meeting of all members of Local #207 to consider declaring any dairy unfair that receives milk hauled by non-union men and pickets shall be placed on the unfair dairy." Appellant Jackson testified, however, that he never intended to interfere with any producer who brought only his own milk to a plant in his own truck.

That was the real point in dispute between Secretary Jackson of the Union and president Mulligan of the Producers Association. Mulligan conceded the right of the Union to organize the *hired* milk

haulers, but denied its right to unionize contract haulers who owned their own trucks and routes and hauled the milk at a price per hundred pounds. Jackson conceded that a producer could haul his *own* milk to the plant. But he demanded that the producer join the Union if he brought along milk belonging to anyone else; and contended that all other haulers must join, even though they be part time haulers also doing work on the farm as a hand, etc. In other words, no farmer could *send* his own milk to the plants: he must go, himself.

If the averages already stated for the five routes covered by the evidence hold good ▇▇▇ for the whole area, this would mean the only escape from unionization of the 55 haulers therein would be for each of more than 1800 producers to take time from his farm work and market his own milk daily. One witness speaks of there being 700 routes. A substantial part of these are stub or feeder lines. But 40 trucks go into Kansas City every day hauling milk. And there are more truckers than trucks. Still, the estimate just made of the number of producers in the area may be too high, for a considerable part of the 55 haulers are hired by the others. Nevertheless it pictures a highly undesirable economic situation. Furthermore, if the milk haulers are not independent contract haulers but employees of the rural producers and/or the Producers Association, the latter would be liable for the torts of the former in the line of duty under the system now prevailing, which requires the producers to send or take their milk to the processing plants instead of the plants' calling for it.

Appellant Jackson gave the following reasons for wanting to organize the rural haulers. He said some of the hired haulers drew much less pay than was received by the union workers in the milk plants. Also there were certain distributors in Kansas City owning their own vehicles, who purchased milk at the plants and sold it to customers. These, also, were organized. Jackson asserted the disparity between the earnings of the rural and the unionized employees caused bad conditions in the milk plants and had a tendency to cut down the wages and working conditions the Union had won for its members. He stated the hired rural haulers received $25 to $40 per week of seven days, with no hours specified, no overtime, no vacation allowance, and no grievance procedure or contract: whereas unionized city haulers got $38.50 per week of 48 hours, time and a half for overtime, eight days a year vacation with pay, grievance procedure and a contract. Ice cream drivers had still shorter hours and longer vacations.

The specific evidence showed that one hired hauler received $40 per week; another $35; another $30; and another $25. This last was merely a part time helper who assisted in loading and unloading the truck. One route owner used his farm hands to transport his and four neighbors' milk. It took only about an hour per day, as his

farm was close to the plant. The route owner in each instance furnished the truck. These contract haulers, owning their routes and receiving pay by the hundredweight, apparently make considerable money, as evidenced by the bidding for the routes. Respondent's brief says the routes are worth on the average $4000 to $5000, and in some instances $15,000. But the pages of the transcript are not cited, and we have not found any such evidence in it. Two of the hired haulers worked about 6 hours per day; one 7 or 8 hours; one, no time stated; and one, as explained above, only an hour.

Getting back to the actions of the Union, after its executive board on April 19 had authorized appellant Jackson to notify all union employees at the processing plants in Kansas City to reject all milk delivered by anyone not a member of the Union, he promptly did so. But he gave the notice only to the employees at two of the plants, the Borden Dairy Company and the Aines Dairy. He testified that he omitted the five other plants because: "Well, I didn't want to shut off all the milk in Kansas City at one time so the public would suffer. . . . It was in the (news)paper that they would enjoin me. I didn't want to take action until I saw how that suit came out." For that reason also, the Union executive board merely ordered its members at the two plants to stop "any two" non-union haulers. But the effect of it, of course, would be to keep all such haulers guessing as to which two of them would have their milk rejected. Appellant Jackson on cross-examination admitted his "purpose and motive was to see that they got into (the) Union." This necessarily referred only to the contract haulers, because his right to organize the hired truck drivers was not disputed.

On the morning of the next day, April 20, when respondent Steve Rogers drove up to the dock of the Borden Dairy Company in Kansas City with a truck load of milk produced by himself and 27 other dairymen on his route, there were one or two haulers ahead of him. He had received intimations that he might encounter trouble, and for that reason had driven his own truck to the plant that morning. He waited his turn, and when it came appellant Mitchell refused to accept the milk, and also the separate part of it which had been produced by Rogers on his own farm, because of the order from the Union. He so stated to Rogers and the dock manager for the Dairy Company, Tom Larsen. Rogers took the milk back to the farmers who had consigned it, and it was spoiled for dairy purposes.

That same morning at the Aines Dairy a Union employee on orders from the Union headquarters refused to handle milk delivered by hauler Ross Lightfoot from Cass and Jackson county producers, unless he would join the Union. He was forced to return the milk to its consignors in an unmarketable condition as Grade A milk. Another hauler named Owings testified he had been told by members of the Union that if he didn't join his milk probably wouldn't be un-

loaded; and that "we will make you join if the rest of them do." However, he did not haul in any milk that day. There were no threats of physical violence or disorder of any kind then or thereafter on the part of the Union employees, nor have there been since this suit was filed the next day. They simply refused to unload milk brought in by anyone not a member of their union. None of these Union employees were called as witnesses.

The statute, Sec. 8301, on which respondent Rogers relies, is as follows:

"Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this state, or any article, or thing bought or sold whatsoever, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and shall be punished as provided in this article."

It would seem the broad terms of this statute apply literally to the facts of this case. For appellants by their own admission in order to enforce a closed shop in the contract milk hauling business in the Kansas City area, have entered into a confederation in restraint of competition in the transportation of fresh fluid milk to all the milk processing plants in that area. And the milk is a commodity in this State that is bought and sold. But they nevertheless contend the decree of injunction against them was prejudicially erroneous for the several reasons already stated in the second paragraph of this opinion.

Looking first to appellants' contentions that the respondent's petition and evidence were fatally deficient. These two assignments go hand in hand. The evidence followed the petition, and if one was sufficient the other was also. Appellants did not challenge the petition below, but merely answered to the merits. Here, they have cited four Missouri[2] decisions on that point. We cannot take the space to review them at any length. Suffice it to say all four cases were conspiracy damage suits. The Root case merely charged peaceful picketing, a constitutional right. The Stephens case was against the members of an association of liverymen and undertakers, who refused to *loan and exchange* equipment with the plaintiffs (non-members) as they did with each other. The Co-operative Livestock Commission case charged a conspiracy by the members of a Livestock Exchange to fix prices and to boycott the plaintiff non-member, and those who

[2]Root v. Anderson (St. L. Ct. App.), 207 S. W. 255, 256-7; Stephens v. Liverymen & Undertakers Ass'n. (Banc), 295 Mo. 596, 604, 246 S. W. 40, 42; Co-operative Livestock Commission Co. v. Browning (Div. 1), 260 Mo. 324, 344-51, 168 S. W. 934, 938-40; Shaltupsky v. Brown Shoe Co. (Div. 1), 350 Mo. 831, 835, 168 S. W. (2d) 1083, 1086(2-4).

dealt with it, in the purchase and sale of livestock. The opinion was by a divided vote, and has been cited on that point in only one case[3] —where the conspiracy charge was upheld.

In the Shaltupsky case[2] the charge was that a single banker and a single shoe ,wholesaler conspired to deprive the plaintiff shoe retailer of his valuable trade connections with the latter, and thereby to destroy his business. The decision held both defendants legally could discontinue business with the plaintiff if their concerted action did not invade his rights; and that the petition failed to state facts showing how the withdrawal of one bank and one shoe manufacturer from doing business with plaintiff would do that—meaning, he could establish business connections with some other bank and shoe wholesaler.

Appellants make that point here. They say the petition failed to allege and the evidence failed to show the respondent was damaged and his rights invaded by the concerted action of the members of the Union in refusing to handle his milk, because it was neither pleaded nor proven that the non-union haulers could not have taken their milk to some other processing plants. As to that, the petition after stating the facts alleged appellants' object and purpose was to restrain competition in the transportation and sale of milk, and to create a Union monopoly in the hauling thereof from the Kansas City area to the market outlets therein. It further alleged the effect of appellants' concerted actions would be to restrain trade in milk as a commodity, and to lessen competition among contract milk haulers, and create a monopoly; that it would prevent milk producers from having their milk delivered to the Kansas City dairy plants except under Union dictation; that it would jeopardize the business of the rural milk producers and the contract haulers; and that it would destroy the value of the producers' fluid milk, and the value of the contract haulers' milk routes and specialized trucking equipment used thereon, and would breach their contracts with the Producers Association.

We think this pleading was sufficient to charge the contract milk haulers and producers in the Kansas City area had no available outlet for their milk other than at the processing plants therein which were dominated by appellants' closed shop Union. While that fact was not expressly alleged it was inferentially, and the issue was treated as being in the case. The pleading is at least good enough to withstand challenge for the first time on appeal, where the petition cannot be amended as could have been done if the point had been raised in the trial court. Under Sec. 140(a) of the new Civil Code, Laws Mo. 1943, p. 395, Mo. R. S. A. Sec. 847.140A, such assignments

[3]Dietrich v. Cape Brewing & Ice Co. (Div. 1), 315 Mo. 507, 516, 520-1, 286 S. W. 38, 41(6), 43(14). See also Reisenbichler v. Marquette Cement Co., 341 Mo. 744, 747-8, 108 S. W. (2d) 343, 345(2, 3).

998

can be made initially on appeal. But in view of subsection (b) thereof and Sec's 57, 62, 65, 66 and 82, R. S. A. Sec. 847.57 et seq., the pleading should be construed on appeal with reasonable liberality to prevent entrapment unless it wholly fails to state a cause of action.

The evidence clearly sustained the petition. There was no showing or contention by appellants that other markets for fresh fluid milk were available to the haulers and producers. In fact, appellant Jackson testified that he knew of only one milk processing plant in the general area that he had not unionized—a smaller one over in Kansas. And he admitted that rejection of the milk at the plants controlled by his Union would shut off the entire milk supply of Kansas City. For he said he gave orders for the boycott to the Union employees at only two of the seven milk processing plants, because he didn't want to shut off all the milk in Kansas City so the public would suffer; and also in view of the threatened injunction suit.

Later he said the milk supply could not have been cut off because 42 haulers had already joined the Union before the boycott was ordered. But that of itself admitted the Union's control over the fresh milk outlets. The evidence further showed the fresh milk was so perishable that it had to be hauled daily including Sunday, and twice a day in the warm seasons of the year; and that the milk delivered by respondent and hauler Lightfoot and rejected, was spoiled. This indicates ▆▆▆ the milk could not have been hauled on longer trips. Circumstantial evidence is peculiarly admissible in conspiracy cases. State ex rel. Prudential Ins. Co. v. Bland, 354 Mo. 495, 190 S. W. (2d) 234, 236(2). Furthermore, no motion for a directed verdict grounded on the insufficiency of the evidence was filed at the close of the whole case under Sec's 112 and 113 of the Code, and no assignment on that ground was incorporated in the motion for new trial under Sec. 115.

In addition to the foregoing contentions of a technical nature, appellants make further assaults on the petition and proof which go more to the substantive law of the case. They say there was no allegation or evidence of violence, threats or intimidation on their part; or of a malicious intent to injure the respondent personally; or that they were under any contract obligation to him which they violated. In short, they assert that each of them had a right to do all that they are charged with doing and did do; and that what each could do singly they all could do together, citing the Shaltupsky case, supra.[2]

That decision does so state—where the mere force of numbers does *not* of itself exert a peculiar coercive power causing unavoidable damage. An actionable conspiracy, as defined in that case and many others, may have two aspects: it may consist of an executed agreement either to do an unlawful act, or to do a lawful act in an unlawful manner, whereby the plaintiff is damaged. And so, here, even though

the appellants were not guilty of violence, threats, intimidation, malice or breach of contract, and conceding they might have done as individuals all that they did do, yet when *all* the union members at *all* the milk plants in the area confederated to reject the milk, the action was conspirative, if the respondent's milk hauling business thereby would have been destroyed. The Shaltupsky case concedes that. See also, Eastern States Lbr. Ass'n. v. U. S., 234 U. S. 600, 614, 58 L. Ed. 1490, 34 S. Ct. 951, L. R. A. 1915A, 788.

█ Furthermore, there was not a complete absence of threats. Appellant Jackson caused his letter of April 5 to be *personally* delivered by a Union business agent to all the haulers in the area. It called an organization meeting of the milk haulers for April 12, and stated that at that meeting a date would be set when the members of the Union would refuse to unload the milk of any hauler not belonging to the Union. Similar threats were made to hauler Lightfoot. That was not physical violence but its result would be spoilage of the milk for beverage purposes as much as if it had been dumped in the street. It will not do to say without limitation that any group of individuals legally may combine to do acts which will destroy the business of another, merely because the elimination of that other will better their condition in life, hours of work and income, as was held (in part) in Harelson v. Tyler, 281 Mo. 383, 398, 399-400, 219 S. W. 908, 913 (4, 9).

That decision quotes at some length from a Federal case[4] the doctrine that the *direct* object of the combination furnishes the primary test of its legality, which is true. But then the Federal case proceeds to hold that if the *chief* objective is self-benefit and the "incidental" effect is injury to a third party, it is lawful. On the other hand, if self-benefit is merely the "ostensible" purpose, and the actual purpose is *really* malicious, then the combination is illegal. That might be true of genuine competition, but it ignores the injurious effect of such combinations per se and requires them to be malum in se. The doctrine also ignores that part of the definition of a civil conspiracy given in the Harelson case and in the Dietrich and Reisenbichler cases[3] and the Shaltupsky case,[2] which █ brands as a conspiracy an agreement to do a *lawful* act in an unlawful manner.

█ In our opinion the foregoing exception requiring actual malice cannot be written into Sec. 8301. If the direct objective of the confederation, as such, be to restrain or destroy existing trade or competition, as denounced by the statute, that is enough. And where that objective exists it cannot by refined reasoning be dissevered from at least a constructive malicious intent to damage and destroy the competing business. If that were the law any big business pool could

---

[4]National Fireproofing Co. v. Builders' Ass'n., 169 Fed. 259, 265.

claim acquittance on the ground that it was merely promoting the interest of its members, when express malice had not been proven. But as was said in a decision of the United States Supreme Court:[5] "It is too late in the day to assert against statutes which forbid combinations of competing companies that a particular combination was induced by good intentions and had some good effect."

Even in the criminal law where the presumptions are strongly in favor of the accused, he is nevertheless presumed to intend the natural probable consequences of his wrongful acts. And a homicide committed by means likely to produce death of itself imports malice. Further, the doctrine confuses motive and intent. A robbery, theft or embezzlement, for instance, is committed to enrich the perpetrator, but still it is a crime. The same is true of torts with a like objective. Appellants' motive or ultimate reason for the boycott in this case was to get more wages, shorter hours and better working conditions. But as a means to that end their direct and immediate intent was to coerce the non-union haulers into their Union, and consequentially destroy their contract hauling businesses. Appellant Jackson so testified. If this were a controversy between ordinary business interests the result would be undoubted.

No exception can be allowed the appellants here unless it can be based on the ground that labor enjoys a special immunity in such circumstances—this on the theory that there can be no monopoly of labor or services, as held in the Harelson case, supra, citing two earlier Missouri decisions.[6] But that is a common law rule, and must yield to a statute, if the statute is constitutional. The Lohse case, just cited, so concedes. And Sec. 8301 does expressly cover labor or services, at least insofar as it forbids combinations in restraint of competition in the *transportation* of commodities, for transportation is a service and not a commodity. That is as far as we need inquire now. Neither can its meaning be restricted to transportation by corporations or other employers only. Its opening words are, "Any person who shall create, enter into, become a member of or participate in . . ."

Sec. 8301 is the "descendant", so to speak, of Sec. 8966, R. S. Mo. 1899. And the latter was one of the seven statutes upon which was based the historic quo warranto, anti-monopoly proceeding in this State against Standard Oil Company.[7] That decision said the statutes there involved were "limited in their scope and operation to persons and corporations dealing in commodities, and (did) not include

[5]International Harvester Co. v. Missouri, 234 U. S. 199, 208-10, 58 L. Ed. 1276, 34 S. Ct. 859, 52 L. R. A. (N. S.), 525.

[6]Lohse Patent Door Co. v. Fuelle, 215 Mo. 421, 444(1), 445(4), 114 S. W. 997, 1002(1), 1003(2), 128 Am. St. Rep. 492, 22 L. R. A. (N. S.), 607; State ex rel. Star Pub. Co. v. Associated Press, 159 Mo. 410, 456, 60 S. W. 91, 104-5(6), 81 Am. St. Rep. 368.

[7]State ex inf. Atty. Gen. v. Standard Oil Co., 218 Mo. 1, 370-1, 116 S. W. 902, 1016(35): affirmed, 224 U. S. 270, 56 L. Ed. 760, 32 S. Ct. 406.

combinations of persons engaged in labor pursuits." And that observation was later quoted in the International Harvester case, supra.[5] But it should be explained that the Standard Oil case was filed in this court in 1905; and that at that time Sec. 8966, supra, did not contain the word "transportation." It was added when the statute was repealed and re-enacted in its present form as Sec. 8965, by Laws Mo. 1907, p. 377.

In the Federal field the Sherman Anti Trust Act,[8] broadly denounces "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several ■■■ States, or with foreign nations." Yet it has always been construed to apply to combinations of professions or services in restraint of trade in a proper case. Thus (with special reference to our Associated Press case[6]) it should be noted that the United States Supreme Court recently held[9] the methods of that Association tended "to frustrate the free enterprise system", and affirmed a decree of the District Court enjoining the enforcement of its by-laws insofar as they permitted the members thereof to exclude non-member competitors therefrom and forbade the former to sell news to the latter or to competing news agencies. In other words, it outlawed what was equivalent to a closed shop in the service of furnishing news to publishers. Likewise, in another recent decision,[10] judgments were affirmed without dissent convicting members of the medical profession of conspiring to boycott a group Health Association by refusing to render professional services to the members thereof, and by coercing other physicians to do likewise. So, also, of the service of furnishing moving picture films.[11] The Sherman Act was also applied to labor organizations, but only in given circumstances as will be noticed later.

Going back to our state decisions. In the Lohse case, supra,[6] decided in 1908, this court reversed a ruling below sustaining a demurrer to the plaintiff's petition for an injunction, and held it stated a cause of action. The petition alleged in substance: that the plaintiff conducted a planing mill business employing non-union labor; that the defendant members of a carpenters' union in order to prevent plaintiff and any others in like situation from employing such labor, and to create a union monopoly and closed shop, had boycotted plaintiff's business and conspired to quit the service of any person buying materials from it, and to induce the members of other unions in the same general industry, and contractors and lumber dealers, to do the

[8]15 U. S. C. A., Secs. 1-7, 15, pp. 3-182, 214.
[9]Associated Press v. U. S., 326 U. S. 1, 6, 89 L. Ed. 2013, 65 S. Ct. 1416.
[10]American Med. Ass'n. v. U. S., 317 U. S. 519, 529, 87 L. Ed. 434, 63 S. Ct. 326.
[11]Paramount-Famous Lasky Corp. v. U. S., 282 U. S. 30, 75 L. Ed. 145, 51 S. Ct. 42.

same: that the defendants further threatened the plaintiff and its customers with strikes and lockouts if it did not accede to the defendants' demands, and in some instances did actually cause them; by all of which plaintiff's customers were intimidated, to its irretrievable injury and damage.

The opinion in this Lohse case conceded "that labor organizations might be proper subjects for legislative control and regulation," but added that the Legislature had not done so. Then it went on to say the authorities seemed uniform in holding that "individuals have a perfect legal right to form labor organizations for the protection and promotion of the interests of the laboring classes, and deny the power to enjoin the members of such organizations from peaceably withdrawing from the service of the employer." In other words, they had the right to join a union and to participate in its legitimate activities, and to strike. · But then it proceeded to hold they did not have the right to boycott an employer "regardless of the name by which it is known."

The opinion apparently is based on the common law and sets out lengthy quotations from many decisions of other states. At the close thereof the conclusion announced was that a conspiracy of two or more persons to injure and destroy the business of a person by means of a boycott is illegal. And a distinction was drawn between labor organizations, as such, on the one hand, formed for the direct purpose of advancing the interests of the laboring classes with only an incidental or indirect effect in restraint of trade; and· on the other hand boycotts, which "have for their direct object the immediate effect to injure and damage the business of persons at whom they are directed, and thereby compel them to discharge the non-union laborers, and thereby indirectly and incidentally protect and benefit the parties to the combination or conspiracy." In effect the decision held the conspirators would not be heard to say their paramount object was merely to benefit themselves. It is much like Bedford Cut Stone Co. v. Journeymen S. C. Ass'n., 274 U. S. 37, 71 L. Ed. 916, 47 S. Ct. 522, 54 A. L. R. 791.

We must interpolate here that the Lohse case should not be considered authority on the point that Sec. 8301 does not cover labor combinations in restraint of trade or competition, when outside the legitimate orbit of such organizations. It, also, was brought here early in 1906, and of course originated in the circuit court prior to that—all long before the statute was enacted in its present form in . 1907. But that point is not crucial. It is conceded the instant case is also founded on the common law, and a large number of State decisions have held labor boycotts are illegal.[12]

---

[12]12 C. J., p. 593, Sec. 124; p. 595, Secs. 131, 132; pp. 596-7, Secs. 133-138; 41 C. J., p. 168, Sec. 164; p. 170, Sec. 166; 15 C. J. S., pp. 1012-4, Sec. 12;

Appellants urge upon us two cases decided by the St. Louis Court of Appeals.[13] In both of these the facts were much like those here. The plaintiff in each operated an open shop planing mill, of which there were about twenty in St. Louis. There were also four or five closed shop mills. The defendants belonged to a carpenters' union with jurisdiction over both carpenters and planing mill workers. They attempted to unionize the non-union mills, and boycotted them and their products by making a trade rule prohibiting union carpenters from handling or erecting millwork not bearing the union label. Both decisions distinguished the Lohse case on the ground that it turned on a demurrer to the plaintiff's petition, which admitted all the allegations thereof, whereas in the two planing mill cases the evidence was that the defendants were not actuated by malice or a primary design to injure the plaintiffs or any other non-union employer, but only by the prime purpose of bettering their own conditions in the plaintiffs' mills and all other non-union mills.

This raises the same question we have already discussed. We have reexamined the long petition in the Lohse case, and are unable to find that it anywhere charged malice upon the part of the defendants therein. All it did was to allege the facts concerning the combination between the defendants and the boycott, with the further charge of an intention to injure the plaintiff and other open shop employers in like business, and thereby coerce a closed union shop. The only material difference between the Lohse case and the two cases under review is, that in the latter the defendants' testimony disclaimed any *primary* design to injure the plaintiff. But it must have been and was known to all of them that the necessary and, in fact, intended result of their action was to injure the business of the non-union mills and *thereby* coerce a closed shop with resultant benefit to them. The defendants had a right to strike and to advocate their cause by peaceful picketing, etc., but coercion and intimidation of third persons into withholding their patronage from the plaintiffs, would be entirely different.

The concluding part of the Lohse opinion, as we read it, expressly denounces boycotts as an illegal exercise of labor's rights under the common law—and their rights are no broader under Sec. 8301. When all is said and done, the question must be answered whether a combination of employers would have the same rights under the common law and that statute as were claimed by the defendants in the two planing mill cases. The opinions therein cite as authority one case

28 Am. Jur., p. 317, Sec. 125; 31 Am. Jur., p. 961, Sec. 260, p. 962, Sec. 261; Annotations: 6 A. L. R., p. 909; 16 A. L. R., p. 230; 27 A. L. R., p. 651; 32 A. L. R., p. 779; 52 A. L. R., p. 1144; 54 A. L. R., p. 806; 116 A. L. R., pp. 484, 513.

[13]Crescent Planing Mill Co. v. Mueller, 234 Mo. App. 1243, 123 S. W. (2d) 193; Frank Schmidt Planing Mill Co. v. Mueller, 154 S. W. (2d) 610.

1004

from New York and two from California,[14] both populous and highly industrialized states. And it appears from ▮▮▮ the Pierce case that California at the time had a statute limiting the meaning of the word "conspiracy" and the use of injunctive process in labor disputes.

▮▮ Appellants also rely on several decisions of the United States Supreme Court and one other Federal decision[15] upholding the right of union labor to strike and engage in peaceful picketing as a matter of personal liberty, free speech and assemblage under the First and Sec. 1 of the Fourteenth Amendments, which cover the same ground as Sec's 8, 9 and 10, Art. 1, Constitution of Missouri, 1945. They argue that their refusal to handle for their own employers the milk brought to the processing plants by non-union haulers, and respondent in particular, was a means of *persuasion* and came within the constitutional right of free speech. Specifically, they invoke the Stapleton case just cited below. And that decision did hold unconstitutional Sec. 12 of the Kansas Session Laws, 1943, c. 191, which forbid any person, as the opinion states, "to refuse to handle, install, use, or work on particular materials or equipment and supplies because not produced, processed, or delivered by members of a labor organization." It appears from Shepard's U. S. Supreme Court Citations that an appeal in the Stapleton case was dismissed on November 13, 1945, by stipulation, costs to be equally divided.

As we read the Stapleton opinion, the holding therein is not based on the right of free speech, but on the personal right "to choose the terms and conditions under which one will work, *like*" the right of free speech, which is the language of the opinion. Undoubtedly unionized employees would have the right to quit work or to refuse to accept employment because of undesirable conditions, or for any other reason, even an unworthy one (absent a contract to the contrary). Hunt v. Crumboch, 325 U. S. 821, 89 L. Ed. 1954, 65 S. Ct. 1545. But if, for instance, in this case they had conspired with their own employer to restrain competition in the interstate marketing of milk they would have been liable under the Sherman Anti Trust Act, even though they acted in furtherance of their own interests; whereas, if they merely confederated with each other for a like purpose they would not be liable under that Act. Allen Bradley Co. v. Local Union No. 3, etc., 325 U. S. 797, 89 L. Ed. 1939, 65 S. Ct. 1533.

This shows labor conspiracies in some circumstances are still under

[14]Bossert v. Dhuy, 221 N. Y. 342, 117 N. E. 582, Ann. Cas. 1918 D, 661; J. F. Parkinson Co. v. Bldg. Trades Council, 154 Cal. 581, 98 Pac. 1027, 21 L. R. A. (N. S.) 550, 16 Ann. Cas. 1165; Pierce v. Stablemen's Union, 156 Cal. 70, 103 Pac. 324.

[15]Senn v. Tile Layers Protective Union, 301 U. S. 468, 81 L. Ed. 1229, 57 S. Ct. 857; Thornhill v. Alabama, 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; A. F. of L. v. Swing, 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568; Bakery & Pastry Drivers & Helpers v. Wohl, 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816; Stapleton v. Mitchell, 60 Fed. Supp. 51, 61(15).

the ban of the Sherman Anti Trust Act. In other words, outside of the fundamental guarantees in the Bill of Rights in the Federal and State Constitutions, the question of the legality of such combinations is one of statutory law, not constitutional law. And the right to boycott for coercive purposes is not one of those fundamental rights, so far as we are aware. The history of the Federal legislation on this general subject is reviewed in the Allen Bradley case last cited above, beginning with the Sherman Anti Trust Act,[8] originally enacted in 1890, and followed by the Clayton Act,[16] originally enacted in October, 1914; the Norris-LaGuardia Act,[17] enacted in March, 1932; and the Wagner National Labor Relations Act,[18] enacted in July, 1935.

This history shows the question of boycotts in aid of labor conspiracies has always been regarded as statutory. A number of Federal decisions on the point are cited in the annotations in 15 U. S. C. A. notes 143, pp. 44 and 160, p. 58. Comparatively it was only recently that the Sherman Anti Trust Act was practically shorn of its application to labor conspiracies, by such provisions as Sec. 17 of the Clayton Act declaring "the labor of a human being is not a commodity or article of commerce," and legitimizing labor, agricultural and horticultural organizations for mutual help; and Sec. 52 of that Act and nearly all the provisions of the Norris-LaGuardia Act ▆ restraining the use of injunctive process in labor disputes.

Furthermore, Sec. 113(c) of the Norris-LaGuardia Act in defining a "labor dispute" said it will be that "regardless of whether the disputants stand in the proximate relation of employer and employee" thereby including secondary boycotts.[19] Sec. 152(9) of the National Labor Relations Act reiterates this provision, and the whole Act validates closed shop unions. We have no such statutes in Missouri. Our law remains the same as the Federal law was before the passage of the three Acts mentioned in the last paragraph. And in the absence of an authoritative decision to the contrary, we follow our Lohse case, supra,[6] and hold the conspiracy between appellants violated Sec. 8301 of our statutes and the common law, and was not protected by the First and Fourteenth Amendments, and Sec's 8, 9 and 10, Art. 1, Const. Mo. 1945.

▆ Appellants contend the Milk Wagon Drivers case just cited establishes that a bona fide labor dispute existed between them and the respondent, within the meaning of Sec. 113(c) of the Norris-

---

[16]15 U. S. C. A., Secs. 12-27, pp. 185-318; 28 U. S. C. A., Secs. 381-383, pp. 247-254; 29 U. S. C. A., Sec. 52, p. 34.

[17]29 U. S. C. A., Secs. 101-115, pp. 47-83.

[18]29 U. S. C. A., Secs. 151-166, pp. 84-438.

[19]Lauf v. E. G. Skinner & Co., 303 U. S. 323, 82 L. Ed. 872, 58 S. Ct. 578; Milk Wagon Drivers Union, Local No. 753 v. Lake Valley Farm Products, Inc., 311 U. S. 91, 85 L. Ed. 63, 61 S. Ct. 122; U. S. v. A. F. of M., 47 Fed. Supp. 304; affirmed, memo., No. 670, 318 U. S. 741, 87 L. Ed. 1120, 63 S. Ct. 665.

LaGuardia Act and Sec. 152(9) of the National Labor Relations Act. They concede the two Acts are not binding in this controversy but maintain we should rule in accordance with them as a matter of public policy. In that case, A. F. L. union employees of dairies delivering milk to consumers in Chicago, picketed stores which retailed milk at cut prices. The stores were supplied by other dairies, "vendors" and a Wisconsin co-operative farm products association, all of which delivered the milk to the stores through C. I. O. union employees. The latter brought injunction against the members of the picketing union and the co-operative association. Primarily, it was a contest between the two unions.

The decision held a bona fide labor dispute existed under the Norris-LaGuardia Act. Another similar case is Milk Wagon Drivers Union, No. 753 v. Meadowmoor Dairies, Inc., 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552. In these two cases the employees were in fact hired employees, and the "vendors" were jobbers who bought and resold the milk. Respondent answers that the cases are not in point because it is conceded here the hired truck drivers may be unionized and he is neither a hired employee nor a jobber, but is in fact an independent contract hauler engaged solely in the transportation of the milk.

Replying to that, appellants cite N. L. R. B. v. Hearst Publications, Inc., 322 U. S. 111, 88 L. Ed. 1170, 64 S. Ct. 851, which held that newsboys selling Hearst newspapers on the streets of Los Angeles full-time at established spots or corners designated by the publisher's district managers, were "employees" within the meaning of Sec. 152(3) of the National Labor Relations Act. In so ruling the decision held the word "employee" as used in the Act is not a word of art, but must "take color from its surroundings"; and "that its applicability is to be determined broadly, in doubtful situations, by underlying economic facts rather than technically and exclusively by previously established legal classifications."

In our opinion the facts here are very different from those in the Hearst case, supra. Furthermore, Sec. 152(3) of the National Labor Relations Act also provides the term "employee" does not "include any individual employed as an agricultural laborer." Applying here the broad rules of interpretation stated in the Hearst case, and consulting the underlying economic facts, is respondent an agricultural laborer? The facts proven are that the milk processors in Jackson County, with perhaps slight exceptions, do not assume the burden of transporting the milk from the farms to their plants, or the expense involved, or the risk of its spoilage or of tort liability for personal injury, and the like. The milk producers are required to deliver the fresh unprocessed milk to the plants as the last step in its production. In order to avoid tort liability and the distractions of labor disputes and the loss of time from farm work

which would result if each of the many producers personally delivered his own milk, they have established milk routes which were owned and operated by contract haulers who furnished their own equipment and were at the time licensed by the Office of Defense Transportation and the Missouri Public Service Commission. Some of the producers own routes, which in some instances can be very conveniently operated by hired farm hands as a part of the farm work. The evidence about the bidding for these routes indicates that the contract milk haulers make considerable money from their routes, but the amount is not shown. Under the Union scale of $38.50 per week they would get $2000 per year, with the amount of overtime pay, if any, not shown.

We hold the respondent was an independent contractor under our state law.[20] Neither the producers on the milk route nor the Producers Association had or claimed any right to control over the details of his work or his physical conduct. He could and did hire his own assistants. The fact that the Producers Association could determine the destination of the milk, and could change the routes, and that the producers' contracts with the haulers were made subject to the former's contracts with the Association, did not create a relation of master and servant.

And in our opinion he was not an employee but an agricultural laborer within the meaning of Sec. 152(3) of the National Labor Relations Act. If the Producers Association had hired the haulers as servants directly or indirectly for commercial or manufacturing purposes, or processing connected therewith, it seems they would have been "employees", though dealing with farm products.[21] But the holdings are the other way where the work is a part of the production of an agricultural commodity, as was conceded in the Edinburg and North Whittier cases just cited, and was held in two others.[22] It has been expressly ruled that workers on a dairy farm processing and delivering milk are agricultural laborers under the Unemployment Compensation Act of the State of Washington. State v. Christensen, 18 Wash. (2d) 7, 137 Pac. (2d) 512, 146 A. L. R. 1302. And this court has held "agricultural labor" includes the horticultural labor of a florist in growing flowers, under our Compensation Act. St. Louis Rose Co. v. Unemployment Comp. Commission, 348 Mo. 1153, 159 S. W. (2d) 249.

On the matter of Public policy. Sec. 102 of the Norris-LaGuardia Act and Sec. 151 of the National Labor Relations Act both contain

---

[20]State ex rel. Chapman v. Shain, 347 Mo. 308, 313(1, 2), 147 S. W. (2d) 457, 460(2).

[21]N. L. R. B. v. Holtville Ice & Cold Storage Co., 148 Fed. (2d) 168; N. L. R. B. v. Edinburg Citrus Ass'n., 147 Fed. (2d) 353, 354(2); Potato Growers, Inc., v. N. L. R. B., 144 Fed. (2d) 295, 301(2); North Whittier Heights Citrus Ass'n. v. N. L. R. B., 109 Fed. (2d) 76, 80(1, 2).

[22]Vives v. Serralles, 145 Fed. (2d) 552, 555(1, 2); Gaylord Guernsey Farms v. Jones, 41 Fed. Supp. 367.

declarations of public policy, based oh the inequality of bargaining power of the individual laborer as against corporate and other forms of ownership association. For the same reason Sec. 17 of the Clayton Act legitimized both labor and agricultural organizations. It was to protect the weak against the strong. Now the conditions are reversed. Labor organizations have acquired overpowering strength. The Union in this case is sponsored not only by a national but an international union.

It proposes to invade an extensive rural area and coerce the contract milk haulers into its membership or destroy their business by rejecting the milk they deliver to the processing plants. The hauling is a part of the milk production and is essentially agricultural, as much so as herdsmen and feed raisers for the dairy herds. It is furthermore a vital food. In our view State public policy does not lend itself to a furtherance of such an objective.

 We think the judgment below should be affirmed. But the decree is too broad. It enjoins the appellants ''and all persons claiming under or acting under the direction or authority of them, or any of them, from hindering, interfering with, preventing or endeavoring to prevent, interfere with or hinder in any respect whatsoever, the receipt, unloading and processing of any milk carried in any truck operated or caused to be operated by the plaintiff, the said Steve Rogers, his agents, employees or representative, to the said Borden Dairy Company, in Kansas City, Missouri.''

The appellants would have a constitutional right by peaceful picketing and persuasion and means not involving violence, intimidation and coercion to advocate the cause of their Union and thereby advance their own interests. A similar criticism was made of a decree in the Lauf case, supra.[19] For this reason the cause is affirmed and remanded with directions to redraft the decree in such manner as to obviate the criticisms specified in the Lauf case. All concur.