MISSOURI CAFETERIA, INC., a Corporation and MISS HULLING'S CAFE-
TERIA, INC., a Corporation, Plaintiffs-Appellants, v. HOWARD MC-
VEY, KATHERINE (KITTY) AMSLER, ETHEL TAYLOR, JESSE K.
KELLER, JOSEPH BROWN, PATRICK J. BURKE and JOSEPH CELESLIE,
Defendants-Respondents, No. 41867—242 S. W. (2d) 549.

Court en Banc, October 8, 1951.

584

*John R. Stockham, Roscoe Anderson* and *William R. Gilbert* for appellants; *Anderson, Gilbert Wolfort, Allen & Bierman* of counsel.

588

*Bartley & Bartley* for respondents Jesse K. Keller and Joseph Brown; *Wiley, Craig & Armbruster* for respondents Howard McVey and Patrick J. Burke; *Claude W. McElwee* for respondents Kitty Amsler, Ethel Taylor and Joseph Celeslie.

590

ELLISON, C. J.—The plaintiffs-appellants are two Missouri corporations under the same management, one named Missouri Cafeteria, Inc., and the other Miss Hulling's Cafeteria, Inc. Each operates a restaurant and bakery shop on a non-union basis in St. Louis known as "Miss Hulling's", their respective locations being 1103 Locust Street and 725 Olive Street. The defendant-respondents [except Burke] are officers and agents of the Hotel & Restaurant Employees and Bartenders International Union, A. F. of L., or the subordinate local unions thereof sometimes called the "Waitresses Local" and the "Cooks Local." Defendant McVey was the president of the St. Louis Local Joint Executive Board of said International Union. Other defendants were officers of said locals and two were also officers of said Joint Executive Board. Defendant Burke was an officer of another union sometimes called the Milkwagon Drivers, and was assisting the other defendants.

Plaintiffs brought this suit to enjoin an alleged conspiracy between the defendants charged to be in violation of the common law and the Missouri anti-trust laws, which included picketing claimed to be illegal. At the close of plaintiffs' case, the defendants' motion to dismiss was sustained and a judgment entered against plaintiffs, from which they appealed. Our appellate jurisdiction is invoked on the ground that constitutional questions are involved under the First, Fifth and Fourteenth Amendments, Const. U. S., and Sec's 2, 8, 9 and 10, Art. I, Const. Mo. 1945. Respondents concede such issues are in the case. We have reached the conclusion that the plaintiffs' evidence did not establish the right to an injunction against picketing at the time of the trial but did show that defendants had been engaged in an illegal boycott before and when the suit was filed, and therefore the judgment dismissing plaintiffs' action should be set aside and the case remanded for further proceedings.

When plaintiffs refused to enter into a contract with the union, defendants set up pickets at the customers' entrance and also at the service entrance of both restaurants, the pickets at the latter entrance being aimed at union truck drivers of other employers making

deliveries of supplies. On the first day the signs carried by the pickets had the false statement that the pickets were "on strike", or the charge that the cafeteria was "unfair", which is claimed to be false. Thereafter, both before and after the suit was filed, the signs carried only the true statement: "This Cafeteria is Non-Union."

On October 17, 1949, the date the picket line was set up, defendant Burke threatened an official of a dairy company that supplied milk to plaintiffs that the dairy plant would be closed if any deliveries were made to plaintiffs. For a period of about nine or ten days said dairy company made no deliveries to plaintiffs, including a refusal to deliver milk to a truck sent by plaintiffs to the dairy plant. Another dairy company made a similar refusal, and the cafeterias were without milk for that period. On October 27, 1949, two days after suit was filed, a stipulation was entered into governing the conduct of defendants pending the hearing on the merits. This stipulation provided that no demands or requests would be made against suppliers not to sell or deliver to plaintiffs and that no threats or reprisals would be made against such suppliers. Thereafter, plaintiffs were able to pick up milk at the dairies with their own truck, but the dairies' truck drivers would not run the picket line to make deliveries as had previously been done.

Defendant McVey, a few days before suit was filed, threatened plaintiffs' regular egg supplier with heavy loss if he made any more deliveries to plaintiffs, and he agreed not to do so. After the stipulation was signed six days later, he made deliveries to plaintiffs' truck.

Cumulative, but less direct, evidence of similar action against other suppliers was rejected, plaintiffs claiming error in such rejection. Copies of minutes of the Joint Executive Board afford further evidence that defendants acted together for a common purpose. After October 27, 1949, the date of the stipulation, union truck drivers refused to cross the picket lines and most suppliers did not make deliveries into the cafeterias, although a few made curb deliveries. But plaintiffs, with minor exceptions, and at considerable expense and inconvenience, were able to pick up in their own truck the supplies required for the operation of their cafeterias.

The picketing must be regarded as substantially peaceful. The general pattern was a single picket at each entrance. Plaintiffs claim that the following isolated incidents rendered the picketing non-peaceful; intervention by the police on one occasion to prevent possible violence when tempers had flared up and a crowd had gathered; a picket being joined by several allies, who may or may not have been reserve pickets, in a peaceful, though pungent, argument with a truck driver who ran the picket line; the use of the word "scab" on one occasion; a disrespectful remark concerning the circuit court; a warning to a truck driver that he might get into trouble with his union if he ran the picket line (presumably this "trouble" did not mean physical

violence, but merely that he would be charged with union disloyalty or possibly fined for crossing the picket line). Under the Federal decisions which will be discussed later, these incidents fall short of what is required to forfeit constitutional rights of free speech so as to justify an injunction against picketing.

The stipulation provided the pickets would not suggest to any delivery man crossing a picket line that he was or might be violating a rule or by-law of his own union by so doing. This clause was not complied with by defendants. Union truck drivers who had been notified of the stipulation and thought they could properly cross the picket line were told a strike was on; that they might get in trouble with their union; that they were "a hell of a union man" to run the picket line; or to call up their business agent to see if they had the right to cross the line. However, this did not transgress peaceful persuasion under the decisions hereinafter cited.

On the day the stipulation was filed defendants also filed a written "renunciation" in which they renounced any intention of being guilty of any conduct in the future which would not conform in substance to the standards set in the stipulation. Both included elimination of the words "on strike" or "unfair" from their signs and from verbal statements of pickets. This renunciation was filed in the case.

If we ignore the first ten days, including eight days before the suit was filed, then the trial court was clearly right in dismissing the petition. As to the period subsequent to October 27, 1949, the date of the stipulation, the case should be ruled by Caldwell v. Anderson, 357 Mo. 1199, 1205, 212 SW. (2d) 784, 787(3). In that case defendants were seeking to force a non-union building firm to sign a closed shop contract. They set up a picket line stating that plaintiffs were "unfair". Union truck drivers would not cross it. So plaintiffs were required to do their own hauling of building supplies and were thereby subjected to much inconvenience and some delay. Gas and electricity could not be installed in the houses until after they were sold, the pickets being then withdrawn. This was held to be legal picketing for a lawful purpose. The only added factors in the present case [aside from the conduct during the first ten days] were the arguments with truck drivers mentioned in the third preceding paragraph.

Merely verbally reminding a union truck driver of what he already knows is an exercise of the right of free speech through peaceful persuasion. Once it is conceded that under the circumstances of this case and the Caldwell case a picket line aimed at preventing deliveries of supplies by union truck drivers is legal, the added factor of the use of free speech by the pickets does not make the picket line illegal.

A single isolated false statement to a truck driver that the pickets were on strike would not justify an injunction against peaceful

picketing. Nor would the claimed isolated acts of intimidation previously referred to. In Cafeteria Employees Union v. Angelos, 320 U. S. 293, 296, 64 S. Ct. 126, 88 L. Ed. 58, the plaintiffs were restaurant proprietors and the defendant union officials sought to compel them to employ union labor through picketing, including charges that they were "unfair". The United States Supreme Court held that the right to free speech in the future cannot be forfeited because of disassociated acts of past violence, and still less because of isolated incidents of abuse falling far short of violence. The injunctions of the state court were held to violate the 14th Amendment. On the other hand in Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., 312 U. S. 287, 291-295, 61 S. Ct. 552, 85 L. Ed. 836, where the strikers were guilty of repeated acts of violence injunctive relief was granted to the employer against the Union.

The case of Fred. Wolferman, Inc. v. Root, 356 Mo. 976, 204 SW. (2d) 733, where a picket line aimed at truck drivers of suppliers was enjoined, is not in point. The plaintiff there was engaged in interstate commerce and it appeared that defendants were picketing for the unlawful purpose of inducing an employer to coerce his nonunion employees into joining a union contrary to their desires. This was found to be a violation of the National Labor Relations Act. Said Act has no application to a local restaurant supplied by local suppliers.

Plaintiffs urge that the case of Empire Storage and Ice Co. v. Giboney, 357 Mo. 671, 210 SW. (2d) 55, affirmed Giboney v. Empire Storage and Ice Co., 336 U. S. 490, 69 S. Ct. 684, 93 L. Ed. 834, would authorize an injunction against picketing at the time of the trial, but we think the case may be clearly distinguished. In that case the defendant union officials were attempting to organize nonunion ice peddlers and sought to induce every wholesale ice dealer in Kansas City to refrain from selling ice to such peddlers. This was held to be a combination in violation of the Missouri anti-trust laws. Plaintiff ice company refused to join the conspiracy and was picketed by defendants, causing substantial damage to plaintiff's business. An injunction against picketing was upheld on the ground that the picketing, though peaceful, was for an illegal purpose in violation of the Missouri anti-trust laws. In the instant case there are two fundamental distinctions: first, the illegal combination was abandoned before trial and the picketing at the time of the trial was for a lawful purpose; and, second, the picket line in the instant case was not placed at the plant of the supplier, as in the Giboney case, but at the business establishments which defendants were attempting to organize.

 We stated in the beginning we had reached the conclusion that the trial court did not err in denying plaintiffs' injunction against picketing at the time of the trial on November 30, 1949, but did think it erred in dismissing the plaintiffs' suit. The basis for

that conclusion is that while the picketing alone during the first ten days [before the stipulation was filed] was not itself so aggravated as to be subject to restraint by injunction, yet it was so intermingled with an illegal boycott conspiracy that it became a part thereof and both were subject to injunctive restraint. The evidence is clear and convincing that there was a combination intended to cut off plaintiffs' sources of supplies by threatening to close down the plants or cause other serious economic harm to suppliers who sold or delivered supplies to plaintiffs. This was effective as to at least two suppliers, and evidence rejected as hearsay indicated that probably the conspiracy was effective as to additional suppliers.

This was an unlawful secondary boycott under Lohse Patent Door Co. v. Fuelle, 215 Mo. 421, 114 SW. 997. The illegal boycott in the Lohse case was directed against the customers instead of the suppliers of the non-union plaintiffs. But this does not distinguish the case in principle. The general rule is thus announced at 215 Mo. l. c. 446: ''All the authorities hold that a combination to injure or destroy the trade, business or occupation of another by threatening or producing injury to the trade, business or occupation of those who have business relations with him is an unlawful conspiracy regardless of the name by which it is known, and may be restrained by injunction.'' This Lohse case has been discussed and its principles reaffirmed in the recent cases of Rogers v. Poteet, 355 Mo. 986, 1000-3, 199 SW. (2d) 378, 387-9, certiorari denied 331 U. S. 847, 67 S. Ct. 1732, 91 L. Ed. 1856, and Wolferman, Inc. v. Root, 356 Mo. 976, 981, 204 SW. (2d) 733, 735, 174 A. L. R. 585, 593; certiorari denied 333 U. S. 837, 68 S. Ct. 608, 92 L. Ed. 1122. However, the illegal boycott conspiracy was abandoned after ten days, and two days after this suit was filed. Thereafter, plaintiffs were able to pick up supplies with their own truck, and the picketing became legal picketing which could not be enjoined without violating defendants' rights of free speech.

█ The fact that an injunction against picketing was not justified at the time of the trial does not mean that the trial court could properly sustain defendants' motion to dismiss at the close of plaintiffs' case since plaintiffs' evidence clearly showed that plaintiffs were entitled to injunctive relief *on the day the suit was filed.* A court of equity having once acquired jurisdiction, will retain it until full justice has been done the parties. [Miller v. Haberman, 359 Mo. 1012, 224 SW. (2d) 1002; De Tienne. v. Peters, 354 Mo. 166, 188 SW. (2d) 954; McKay v. Snider, 354 Mo. 674, 190 SW. (2d) 886; Phelps v. Scott, 325 Mo. 711, 30 SW. (2d) 71.] Such relief will be granted even though it involves adjudicating matters of law or rendering a money judgment. [Waugh v. Williams, 342 Mo. 903, █ 119 SW. (2d) 223; Rockhill Tennis Club v. Volker, 331 Mo. 947, 56 SW. (2d) 9; Waddle v. Frazier, 245 Mo. 391, 151 SW. 87.]

The filing of the renunciation by defendants did not deprive the trial court of the equitable jurisdiction it had acquired the day the suit was filed, and it was the duty of the court to award such damages and such injunctive relief, if any, as the evidence at the close of the entire case might indicate. [Champion Spark Plug Co. v. Reich, 121 Fed. (2d) 769, C. C. A. 8]. That was an action to enjoin unfair competition and trade mark infringement and defendant, during the pendency of the action, voluntarily changed his business practices. The trial court denied the injunction but entered a decree for damages which had occurred before the change. On appeal the judgment of the trial court was modified so as to require that an injunction be entered as to certain designated items of infringement which had not been abandoned by defendants.

Considerably more than a year has elapsed since the trial was concluded. The conduct of defendants may have continued peaceful and lawful as it was at the time of the trial. On the other hand, there may have been acts of violence or other unlawful conduct since the trial. Therefore, the ultimate question of whether an injunction should be issued, including even an injunction against picketing, will depend upon the state of the record at the close of the entire case after plaintiffs have had an opportunity to present additional evidence to supplement the evidence at the first trial and defendants have presented evidence covering their side of the case. If the evidence at the close of the whole case does not justify injunctive relief, but still shows that there was an illegal boycott for a short period prior to the stipulation and renunciation, then the trial court should award plaintiffs such damages as they may have suffered on account of the illegal boycott conspiracy.

Plaintiffs further contend that the illegal boycott conspiracy also was a combination in restraint of trade in violation of the Missouri anti-trust law, Sec. 416.010, R. S. 1949, citing Empire Storage and Ice Co. v. Giboney, supra, and Rogers v. Poteet, supra. The facts in both of those cases were more extreme than in the instant case, and we find it unnecessary to decide whether plaintiffs' evidence, if taken as true, would show a violation of the statute cited. Plaintiffs' rights as to injunction and damages would not be affected by the question of whether an illegal boycott conspiracy also constituted a combination in restraint of trade which was prohibited by the Missouri anti-trust laws.

Plaintiffs' Exhibits A, B, C, D and E were all letters from suppliers stating why they were not making deliveries in spite of the stipulation having been signed and a copy sent to them. There was no issue as to the authenticity of the letters, but they were excluded by the trial court on the ground that they were hearsay. We think these letters come within a well-recognized exception to the hearsay rule—that contemporary statements of motive are admissible. In

Lawlor v. Loewe, 235 U. S. 522, 35 S. Ct. 170, 59 L. Ed. 341, a judgment for damages had been entered against labor union defendants on account of an illegal boycott, and the opinion of Mr. Justice Holmes (235 U. S. l. c. 536), stated: "The reason given by customers for ceasing to deal with sellers of the Loewe hats, including letters from dealers to Loewe & Co., were admissible. 3 Wigmore, Evidence, Sec. 1729 (2)."

In the 3rd Edition of Wigmore on Evidence, the rule is stated at Sec. 1729 (2) as follows: "A declaration of present existing *motive* or *reason* for action is admissible,—assuming, of course, that the declarant's motive is relevant.

"So far as concerns *accused persons*, this use is later considered (*post*, sec. 1732). In other cases, the typical instances in which motive becomes material are actions for *loss of service* or of *custom*, in which it is necessary to show that the customer's or servant's abandonment of the plaintiff was motivated by the defendant's persuasion or threats; and actions in which the *reliance* of a person *on another's representations* becomes a part of the issue. The use of declarations of this sort is fully recognized in numerous precedents."

The above-mentioned letters clearly come within the above rule. They were contemporaneous statements of motive giving the reason why these suppliers were not making their customary deliveries, said reason being that their truck drivers would not cross the picket line. Of course, these letters are admissible only for the limited purpose of showing the motive of the suppliers, that is, the reason why they did not make the deliveries. These letters contain other hearsay statements, and are not admissible for the purpose of proving the truth of such other statements. For example, Exhibit D contained a statement that one of their truck drivers told them that four men made threats that "if he unloaded, they would see that he was taken care of." This letter may not be considered as proof that such threats were in fact made, but it is admissible to show the writer's motive in not making deliveries.

For the same reason David Roman, who was in charge of butter sales of the Beatrice Foods Company, should have been permitted to testify what reason he gave plaintiffs during the period of the boycott conspiracy for not permitting plaintiffs to pick up anything or to deliver anything. The same applies to the rejected testimony of R. R. Klauke, sales manager of the Krey Packing Company, as to what reason he gave a representative of plaintiffs for not making deliveries to them. And Harold Plengemeier, assistant general manager of plaintiffs, should have been permitted to testify as to the reasons given by suppliers to him for the failure to make deliveries or the cessation of business relations.

Defendants have cited several cases involving the usual rule that the admission of letters would violate the hearsay rule, but none of

these cases involved comparable facts or discussed this well-established exception to the hearsay rule. Caldwell v. Anderson, supra, has no application, as it merely holds a boycott cannot be proved by a threat from a person whose connection with the union defendants was not shown and which threat did not prove effective. It has nothing to do with declarations by a supplier as to his motives in discontinuing business relations.

Plaintiffs offered Exhibits R and S, which were two issues of the St. Louis Labor Tribune, describing the organization campaign against plaintiffs which was being directed by defendant McVey. In Lawlor v. Loewe, supra, the opinion states "The introduction of newspapers, etc., was proper in large part to show publicity in places and directions where the facts were likely to be brought home to the defendants, and also to prove an intended and detrimental consequence of the principal acts, not to speak of other grounds." That case involved a widespread conspiracy extending over several states, and the degree of publicity was considered an element in the damages. The illegal boycott in the present case was very restricted in nature, and we therefore feel that the ruling in Lawlor v. Loewe, supra, may be sufficiently distinguished. In the absence of a showing that the publication was authorized by one or more of the defendants or that the statements in the articles attributed to defendant McVey were actually made by him to a representative of the paper, these exhibits should not be admitted.

Defendant Kitty Amsler was called as a witness by plaintiffs for the limited purpose of showing a certain conversation she had had with defendant Burke relative to establishing the picket line. Over the objection of plaintiffs, counsel for defendants were permitted to cross-examine defendant Amsler generally on matters not involved in her direct examination. This was not error. Whatever may be the general rule in other states, the question is covered in Missouri by Sec. 491.030 R. S. 1949, which provides that an adverse party called as a witness may be examined by the opposite party under the rules applicable to cross-examination of witnesses. Defendants' cross-examination would therefore be permitted the same scope as though the witness were not a party. However, plaintiffs are not bound by the entire testimony of defendant Amsler. In Lolordo v. Lacy, 337 Mo. 1097, 88 SW. (2d) 353, which construed the corresponding Section 1725, R. S. 1929, the rule is stated as follows: "In any case where a party desires to prove an essential part of his case by his opponent, he is permitted to do so, and he is only bound by the part of his adversary's testimony which he himself offers and vouches for as the truth."

On the retrial of the case the present record shall be considered part of the record in the case, and both plaintiffs and defendants may offer such additional evidence as they may see fit. Evidence

598

erroneously excluded may be reoffered. The trial court should permit amendment of the pleadings to cover anything within the scope of this opinion or any event relative to the labor controversy which has occurred since the first trial. Any party should be permitted interrogatories or additional depositions if desired.

Since appellants failed to establish their major contention that the picketing was unlawful at the time of the trial, the costs of this appeal should be paid one-half by appellants and one-half by respondents.

The cause is hereby reversed and remanded for further proceedings not inconsistent with this opinion. All concur, except *Conkling, J.*, who dissents.