The judgment is, accordingly, affirmed. All concur.

Beatrice ARNOLD, Appellant,

v.

WIGDOR FURNITURE COMPANY, a Corporation, and Great American Indemnity Company, Respondents.

No. 44541.

Supreme Court of Missouri.

Division No. 1.

Sept. 12, 1955.

Joslyn & Joslyn, Charleston, for appellant.

Blanton & Blanton, Sikeston, for respondents.

COIL, Commissioner.

This is a Workmen's Compensation case. Appellant, claimant below, is the widow of Charles Arnold who, when 19 years old, was killed while employed by respondent Wigdor Furniture Company, a corporation. Respondent Great American Indemnity Company is the insurance carrier. The referee made an award of $9,350 to claimant for the benefit of herself and minor daughter. The Industrial Commission reversed and entered its final award denying compensation which was in part: "We find from all the evidence that Charles Arnold, employee herein, was killed accidentally on January 26, 1953, in the course of his employment with Wigdor Furniture Company, but that the accident causing his death did not arise out of said employment. Compensation, therefore, must be and is hereby denied. * * *" The circuit court affirmed that finding and order. Claimant has appealed from that judgment.

Charles Arnold was employed by respondent Wigdor Company as the driver of a truck by which he delivered propane gas to the bulk tanks of employer's customers, who were located both in towns and in the country. He worked from 8 a. m. to 6 p. m. and was subject to call for after hours deliveries, some of which he made during the nighttime. Most of the customers were on a charge basis but as many as four paid cash which Arnold collected and turned in to his employer either the day of, or the day following, the delivery. The cash price for a capacity load of propane was $104; however, it was to be reasonably inferred from employer's evidence that the amounts of cash handled by Arnold for his employer at any one time were less than $100 and that the collections by Arnold were infrequent.

Arnold, on his own initiative and without the direction, knowledge, consent or acquiescence of his employer, had placed a single-barrel shotgun on the right side of the cab floor with the barrel pointed toward the right cab door. This gun had been thus carried by Arnold for several weeks preceding the accident. (There was testimony that prior to the time Arnold began to carry the shotgun, he had a revolver which, when driving, he placed on the opened door of the glove compartment. This, also without employer's direction, knowledge, consent or acquiescence.) None of employer's other truck drivers carried guns and employer had no collection policy which required employees to carry firearms, but there was no evidence that employer had prohibited the carrying of firearms by its truck drivers for protective purposes or that employer had made known to its employees any company policy with respect to

the matter. There was no direct evidence of any other purpose for the presence of the gun than for protection. There was no evidence that deceased had been threatened or pursued or held up at any time, or that his deliveries took him into any notoriously dangerous areas.

On January 26, 1953, the truck was at employer's bulk storage plant and loading dock. Apparently the storage tanks were empty and Arnold and another employee were to fill some cylinders with gas for delivery to consumers of "bottled" gas. Consequently, it was necessary to transfer the propane from Arnold's truck into the storage tanks and thence into the cylinders. The testimony was indefinite as to the precise operation being conducted at the time of the casualty, but it appears that a hose from Arnold's truck was connected with the bulk storage tank and that Arnold and a fellow employee, Chuck Grubbs, were filling cylinders inside some portion of the storage plant. It was necessary to work a lever on the right cab floor to turn on and off the mechanism by which the propane was permitted to flow from the tank truck. The lever could be operated from a standing position to the right of the open cab door. The lever required pressure to raise or lower it. It is not clear whether, at the time of the accident, the tank truck's motor was running for the purpose of transferring the propane from the truck to the storage tank, whether only the motor connected with the storage tank for the purpose of transferring the propane from the storage tank to the cylinders was running, or whether both motors were running, thereby making it possible to transfer propane from the truck to the storage tank and into the cylinders simultaneously.

Arnold told Grubbs that "he had to go outside" and left. In four or five minutes Grubbs heard a "popping sound" and heard Arnold say, "Turn the motor off; I'm shot." Grubbs "shut the gas off" and found Arnold against a fence about ten or fifteen feet from the right side of the truck with a gunshot wound in his left groin which was about the point on Arnold's body

(Arnold was 5 feet, 11 inches tall) which would be even with the floor of the truck's cab if he stood to its right. After the accident the right cab door was open. The gun was on the floor of the truck cab with the barrel toward the right door and there was one discharged shell in the gun.

Prior statements purportedly made by Arnold to his father-in-law and to his 15-year-old brother-in-law were offered and (although it is not entirely clear from the record) both apparently were excluded by the referee. Arnold's father-in-law said that in the "fall of 1952" he rode in the truck in question and upon seeing the shotgun on the floor asked Arnold, "Boy, what are you doing with that gun—what do you haul it for?" Arnold replied, "That is all the protection I ever carried." Arnold's brother-in-law said that he often went along while Arnold made propane deliveries and that Arnold told the witness that he, Arnold, carried the gun "for protection, if someone tried to get the money, for protection."

 We have been cited to no case in this state nor have we found one sufficiently similar factually to be considered a precedent. We have been referred to some cases from other jurisdictions to which further reference will be made. Basically, however, as we analyze the case, we think it must be apparent that if the shotgun was carried in the truck solely for deceased employee's own purposes, unrelated to his employment or the duties thereof, claimant may not recover. This because, under such circumstances, the accident did not arise "out of the employment" in that the causal origin of the injury was unconnected with deceased's employment. See Larson's Workmen's Compensation Law, Vol. I, Sec. 12.31, p. 175, and the two cases there discussed, Bogavich v. Westinghouse Electric & Mfg. Co., 162 Pa.Super. 388, 57 A.2d 598, and Aetna Life Ins. Co. v. Burnett, Tex.Com.App., 283 S.W. 783. It seems clear, however, that the theory of denying compensation on the basis that the employee has been injured by a hazard or instrumentality which he has imported or created should

be confined to hazards and instrumentalities that are not related to the employment. "The mere increasing of the hazards of employment by the employee's using some article in connection therewith that proves to be dangerous is no different from increasing the risk by active negligence in the manner of performing the work; both should be immaterial in compensation theory." Larson, supra, Sec. 12.35, p. 182.

■■ For the present, we shall assume that the credible evidence proved that deceased regularly carried the shotgun in the employer's truck for the purpose of protecting himself and employer's property. Making that assumption, the question is whether under the particular facts there was any reasonable relation or connection between the duties which deceased was employed to perform and the fact that deceased carried the gun in the truck, or whether, under the facts of this case, the carrying of the gun by deceased was a reasonable act in the furtherance of his employer's business. Certainly, the fact, standing alone, that an employee, irrespective of the type of work he is hired to perform, chooses to carry a gun does not furnish the necessary work connection. In the instant case, however, the evidence before the Industrial Commission was to the effect that deceased's duties were to deliver propane gas to bulk tank customers who were located both in towns and in the country, to make night deliveries to any of those customers on call, and to collect money from at least four of those customers on behalf of the employer. Taking into account those facts (essentially proved by employer); taking into account the fact that employer had issued no instructions to deceased prohibiting the carrying of firearms for protection of person and property and had made known to deceased no policy of the company in that respect; taking into account the fact that we judicially know that those engaged in the transport of another's property do at times attempt the protection thereof by carrying firearms; and in view of the fact that it is common knowledge that there are frequent highway robberies, we may not say either, that the presence of the gun in the truck placed there by deceased was not reasonably connected with employee's duties, or, that the carrying of the gun by employee was not a reasonable act in furtherance of employer's business. We think, under all the noted circumstances, that there was sufficient connection between the duties of the employment and the carrying of the gun in the truck to require the conclusion that, under the assumption heretofore made, the accident arose out of the employment.

Respondent's contention to the contrary is based chiefly upon an Ohio case, Highway Oil Co. v. State ex rel. Bricker, 130 Ohio St. 175, 198 N.E. 276. In that case, compensation claimant was employed by Oil Company to operate a filling station. He, at the suggestion of a co-employee (who was in no supervisory status), brought a gun to the station "in case of holdup." The filling station supervisor, claimant's immediate superior, had expressly instructed claimant to conceal about the station any large sums of money and to have available only sufficient money with which to make change, and that in case of holdup, no resistance was to be made as the company was insured against loss from such cause. The opinion points out that while suspicious characters had frequented the service station, no holdups or robbery had ever occurred. The gun was hung on a nail under a desk, and while writing a report, claimant accidentally knocked the gun to the floor, causing its discharge which resulted in injury to, and subsequent amputation of, claimant's leg. The court held that the injury did not arise out of the employment. In so far as the result in that case is based upon the principle that the injury occurred from a danger imported by employee against a prohibition impliedly contained in the conditions of the employment, we think it was correctly ruled. It is at once apparent, however, that the cited case is factually different from the instant case in that, in the Ohio case, there was an implied prohibition in the conditions of the employment to use firearms for protective purposes

in the conduct of employer's business. In the instant case, there was no such prohibition. The principle of the Ohio case is that the workman brought the gun to the premises for his own purposes and for no purpose reasonably connected with his employment. That principle is sound but, for the reasons stated, we think it inapplicable to the facts of the instant case.

Respondents also rely upon the Michigan case of Bull v. Wayco Oil Corp., 250 Mich. 51, 229 N.W. 597, 598. The Michigan court, in holding that the accident there involved did not arise out of the employment, approved this finding of its reviewing department: " 'We are of the opinion it is conclusively shown by the testimony in this record that it was not the policy of the company to permit their employees to keep fire-arms at their gasoline stations, and that their employes were instructed not to resist holdups or robberies on account of the danger to the attendant employes. We think the evidence conclusively shows that the employer did not know the employes of this particular station had this firearm at the station.' "

Here again the prohibition against the use of firearms in the discharge of any of employee's duties was impliedly a part of the condition of the employment.

■ Respondents point out that in the two last noted cases, as well as in the present case, the employer did not have any knowledge of, or acquiesce in, the presence of the gun. We think lack of knowledge of the presence of the gun is important if coupled with it is a direction, specified or implied, that firearms are not to be used for the protection of employer's property; knowledge of the employer under such circumstances might amount to a waiver of that condition of employment otherwise imposed, and thus lack of employer's knowledge or consent would have a decisive bearing upon the ultimate conclusion. However, as we see it, the instant case should not turn upon the fact that employer did not direct employee to carry a gun or that employer had no knowledge of the presence of the gun, or had not given its consent to the presence of the gun in the truck. This, because the fundamental question must be whether the causal origin of the injury was reasonably related to the duties employee was hired to perform and inasmuch as we have held that it was, employer's lack of knowledge cannot, alone, be decisive.

■ Respondents also attach much weight to the facts that there had been no holdups in the area, that deceased had not been threatened, that none of respondents' other employees carried guns, and that there was no credible evidence that employee's deliveries took him into "dangerous" areas. It is true that those matters are important in determining whether the employer reasonably would have anticipated that employee would carry a gun in discharging his duties, but we think that, in this case, what an employer reasonably should have anticipated is only one element in determining the broader question of whether there was, under all the circumstances, a reasonable relation between the duties which the employee had been hired to perform and the presence of the gun in the truck. In determining this broader question we should consider the element of "reasonableness of work connection" both from employer's and employee's standpoints.

The cases relied upon by appellant, Nurmi v. Industrial Accident Commission, 137 Cal.App. 221, 30 P.2d 529, and Holland v. Continental Casualty Co., La.App., 155 So. 63, give some support to the conclusion we have reached. However, those cases are distinguishable from the instant case on their facts in that in both claimant's superior had knowledge that employee was carrying a gun for protection and there were other circumstances in both cases giving the respective employees specific reasons for being fearful of highway robberies.

We have heretofore assumed that the evidence before the Industrial Commission proved that deceased employee had the gun in the truck for his own protection and for the protection of employer's property. We

have heretofore noted that the referee excluded the testimony of both deceased's father-in-law and brother-in-law as to statements made to them by deceased as to his reason for carrying the gun. We cannot tell from the Industrial Commission's finding and award whether it failed to consider that evidence in making its award, or whether it considered it and found it not credible, or whether it considered it, found it credible but concluded, as a matter of law, that even with that evidence and even though it found that such evidence was credible and substantial, the accident did not arise out of the employment. Consequently, for a proper disposition of this case, we think it necessary to determine whether the statements of deceased to third parties as to his motive or reasons for carrying the gun were admissible.

■ In the recent case of Lewis v. Lowe & Campbell Athletic Goods Co., Mo., 247 S. W.2d 800, we held that statements made by deceased showing an existing state of mind were admissible as an exception to the hearsay rule, provided that the declarations appeared to have been made in a natural manner and not under circumstances of suspicion. In the Lewis case deceased, a traveling salesman, told his wife the night before the morning of his departure, in effect, that he would have to leave early the next morning to complete some work for his employer. It appeared that the statements made were natural communications from husband to wife, that no suspicious circumstance or self-serving motive or purpose was apparent to cause the declarations to be other than deceased's spontaneous declarations of a present intent at the time of each declaration to undertake a trip in the course of his employment. We held these declarations admissible under the hearsay exception receiving statements of an existing mental condition, a plan or design to do a specific act, and that they were admissible as tending to prove the fact that the trip was made for the purposes stated. The court relied upon the rule stated in Wigmore on Evidence (3d Ed.), Vol. VI, Sec. 1725, p. 79 et seq. The general hear-

say exception discussed by Wigmore, Secs. 1725–1731, is "Statements of Design, Intent, Motive, Feeling, Etc." Wigmore, supra, p. 79. The same hearsay exception includes "Statements of Motive, Reason, or Intent." Wigmore, supra, Sec. 1729, p. 90. The author, after distinguishing between "motive" and "intent", says at p. 90: "So far as the present Exception is concerned, nothing turns on this distinction between motive and intent. Each is a mental condition, and each is therefore provable by contemporaneous declarations." And at p. 91: "A declaration of a present existing *motive* or *reason* for action is admissible,—assuming, of course, that the declarant's motive is relevant." Certainly, Arnold's motive or reason for having the gun in the truck was relevant to the issues at the compensation hearing. And Arnold's statements of his reason were contemporaneous with the fact of the presence of the gun (not with the time of the accident) in explanation of his reason for having the gun at the time each statement was made.

We think that the statements in question in the instant case were admissible as tending to prove deceased's reason for having the gun in the truck, under the same hearsay exception as the statements were admissible in the Lewis case, supra; provided, of course, that the instant statements appeared to have been made in a natural manner and not under circumstances of suspicion or for a self-serving purpose. See also, Missouri Cafeteria, Inc., v. McVey, 362 Mo. 583, 242 S.W.2d 549, 554 [10]. It should be borne in mind that the statements were not offered to prove the fact that the gun was regularly in the deceased's truck preceding the time of injury. The fact that deceased employee regularly carried the gun in the truck was proved by the testimony of a co-employee who said that he had seen the gun on the floor board of the truck ten or twelve times during the five months deceased drove the truck and that he had last seen it there two or three weeks before deceased was killed. The statements were offered only as proof of deceased's reason for having the gun in the truck.

We do not mean to say, as we shall point out hereinafter, that the Commission needed to believe that the statements by deceased were in fact made or that the circumstances under which they were made entitled them to decisive weight as evidence. Whether deceased in fact made those statements depended upon the credibility of the two witnesses so testifying, and the question of their credibility, along with or as part of the broader question of the weight to be given such statements, if made, as proof of the reason for the presence of the gun in the truck at the time of the accident, were questions for the Industrial Commission.

Assuming, however, that the statements were in fact made, we think it abundantly clear they were natural statements, not made under suspicious circumstances or with any self-serving purpose in mind. It would appear entirely natural and unsuspicious for the father-in-law to have inquired as to the reason, and upon inquiry for deceased to have told the father-in-law his reason, for having the gun on the floor of the truck. Likewise, it would appear natural and unsuspicious for deceased to have told his 15-year-old brother-in-law why he carried the gun. And it would seem obvious that deceased could not well have been then contemplating the possibility of being accidentally shot by that gun and that he was attempting, by self-serving statements, to lay the foundation for a finding at some speculative future time that if he were accidentally shot by that gun during the "course of his employment," his injury would, because of the statements, be held to have arisen "out of his employment." We hold, therefore, that the testimony of the two witnesses as to the statements made by deceased as his reason for carrying the gun were competent and admissible and that the weight to be given them as evidence was a matter for the triers of the fact. Lewis v. Lowe & Campbell Athletic Goods Co., supra.

In Scott v. Wheelock Bros., 357 Mo. 480, 209 S.W.2d 149, 151[3], 152[4], the court pointed out that the Industrial Commission passes upon the credibility of the witnesses and may decide a claim solely upon a finding of the lack of credibility of uncontradicted and unimpeached testimony offered in support of the claim. It was there pointed out, however, that no case had been found in which an administrative agency's award was based solely upon a finding of lack of credibility of claimant's undisputed, unimpeached testimony. See also, Smith v. Smith, 361 Mo. 894, 237 S.W.2d 84, 89 [4–7]. It may well be in the instant case that the Industrial Commission found that the testimony of the father-in-law and brother-in-law did not constitute credible evidence. This, because some of the other testimony of the brother-in-law was impeached and the relationship of both witnesses to the claimant was for consideration on the issue of credibility. Now, if the Industrial Commission rejected this testimony as not credible, then it may be that the ultimate finding of the Commission is supported on the theory that claimant failed to sustain her burden to prove that the accident arose out of the employment. In other words, it may be that the Industrial Commission, as the trier of the fact, reasonably could conclude that claimant, upon consideration of all the credible evidence and reasonable inferences therefrom, failed to prove that the gun was carried in the truck for any purpose other than for the sole use and benefit of the employee, unconnected with any of the duties of his employment.

■ . "In reviewing this workmen's compensation case we have the duty of determining whether the Commission's award is supported by competent and substantial evidence upon the whole record. Const. Art. 5, § 22, V.A.M.S. This does not mean that we may substitute our own judgment on the evidence for that of the Commission. But we are authorized to decide whether the Commission could have reasonably made its findings and reached its result, upon a consideration of all of the evidence before it, and to set aside its decision if clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner Electric Corporation, 355 Mo. 670, 197 S.

W.2d 647." Foster v. Aines Farm Dairy Co., Mo., 263 S.W.2d 421, 423[2, 3].

█ Under all the circumstances we may not say that the Industrial Commission reasonably could not reject the testimony of the two witnesses which tended to prove the reason that employee carried the gun. In other words, we could not hold that the Commission's award, if based on such a finding, was clearly contrary to the overwhelming weight of the evidence. If the Commission did reject that testimony, then there was before it only the fact that deceased more or less regularly carried a shotgun on the floor of his truck with no direct explanation of his reason therefor. We think that the fact alone that the shotgun was on the floor of the truck would support a reasonable inference either, that the gun was carried for the purpose of protecting employee and the employer's property, or, that it was carried solely for some unknown purpose of the employee unrelated to and unconnected with any of the duties of his employment. Which inference should be drawn was a matter for the Industrial Commission. Karch v. Empire District Electric Co., 358 Mo. 1062, 218 S.W.2d 765, 771.

█ But, as we have heretofore noted, we may not determine from the finding in this case whether the Commission's final award denying compensation was based upon a finding that claimant failed to sustain her burden of proof because of its disbelief of testimony adduced on an essential issue, or whether the Commission failed to consider the testimony as to deceased's reason for having the gun in the truck, or whether its finding was based upon its conclusion that all the evidence, including what they found to be the credible evidence of the two witnesses, was legally insufficient to establish the contested claim. Inasmuch as we have held that, if the Commission finds that the testimony of the two witnesses was substantial credible evidence sufficient to prove that the reason for the presence of the gun in the truck was to protect employee and employer's property,

it, with the other evidence, was legally sufficient to require an award of compensation to claimant, we, therefore, reverse the judgment affirming the Commission's award and remand this cause to the circuit court with directions to remand to the Industrial Commission for further proceedings in accordance with this opinion. See Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136, and Smith v. Smith, supra.

It is so ordered.

VAN OSDOL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.