**Roger HALL (Plaintiff), Respondent,**

v.

**W. A. BROOKSHIRE (Defendant), Appellant.**

**No. 29274.**

St. Louis Court of Appeals.

Missouri.

Dec. 20, 1955.

Motion for Rehearing or to Transfer to Supreme Court Denied Jan. 13, 1956.

W.·A. Brookshire, Columbia, for appellant.

Orr & Sapp, Carl F. Sapp, Columbia, for respondent.

WOLFE, Commissioner.

This is an action to recover actual and punitive damages arising out of a libelous letter sent by the defendant to the mother of the plaintiff. There was a verdict and judgment for the plaintiff in the sum of $7,000, $1,000 of which was for actual damages and $6,000 was for punitive damages. From the judgment the defendant prosecutes this appeal.

The case was tried once before. That trial resulted in a verdict for $8,000, but the verdict was set aside by the trial court because of an erroneous instruction. The plaintiff then appealed and the Supreme Court affirmed the action of the trial court in Hall v. Brookshire, 267 S.W.2d 627.

The petition alleges that the plaintiff gave certain testimony on November 27, 1950, as a witness in a trial in Callaway County, and that thereafter, on December 26, 1950, the defendant wrote to Bessie B. Hall, the mother of the plaintiff, a letter in which it was stated: "It is little wonder that your son, who possesses the type of mentality that he does, would go into Court and commit perjury simply because a man has tried to get a decent fence."

The answer admits the writing of the letter but denies that there was any publication of it. The answer concludes by pleading the truth of the statement that the plaintiff committed perjury. The defendant sets out statements made by the plaintiff and alleges that they are perjuries.

It appears from the evidence that Brookshire is a lawyer sixty-two years of age and up to 1946 had practiced law for many years in Farmington. In 1946 he moved to Boone Mounty, Missouri, to live on a farm that he had purchased. After moving to this farm he maintained no law office but had his library in his home and occasionally tried a case in the circuit where he had formerly lived. Most of his time was occupied by stock farming and he had a herd of approximately 250 head of cattle and some pigs.

At some time in 1949 or 1950 Brookshire brought a suit in his own behalf against a man named Anderson. It was brought in a magistrate court of Callaway County. The suit was for fees for legal services alleged to have been rendered by Brookshire in Anderson's behalf. Anderson counterclaimed for the price of some lumber which he alleged that Brookshire had bought from him. Hall, the present plaintiff, although not subpoenaed, was requested to appear as a witness for Anderson. As a witness he was asked if he knew Brookshire's reputation in the community in which he lived, and after stating that he did, in response to

another question he stated that Brookshire's reputation was bad. No objection to the relevancy of such a question was made or apparently raised at any time.

On December 26, 1950, which was about a month after the trial mentioned, Brookshire wrote the letter which is the basis of the present action. The letter was addressed to and mailed to Mrs. Bessie B. Hall, mother of the plaintiff, and is as follows:

"Dear Madam: Yesterday I was over to where your hired men are building a fence. I find that they are building fence on my land in violation of Section Two (2) and Section six (6) of the contract that I entered into with you on March 1, 1950. On that date, you had constructed a fence on your side of the division line. The fence was built out of good wire and fairly good posts. It was built so that two water gates were eliminated. You had completely abandoned the old fence that had been partly on my land. This old fence, which was completely dilapidated, was removed and the fence row completely cleared.

"Under the terms of our contract, you had the privilege of letting the fence stand, or of removing it to the true division line, after you had given ten (10) days notice. In Section Two of the contract the following language is used: 'Parties hereto mutually agree that the fence now existing between their respective farms constitutes a division line fence * * *'. At the time this contract was signed, by you and by me, your part of the fence row and the branch was on your side, and under that contract that fence must either stand, or you must go to the true division line.

"Instead of doing that you have gone over onto my land and built a fence, and you have used a tree that belongs to me for a fence post. This will not be permitted. You are building this fence purely out of stubbornness and spite. Inasmuch as you have built this fence on my land, and a part where there has never been a fence built, you have caused your posts and your wire to become a part of my realty, and legally to become my individual property. However, if you remove the wire and posts, and fill up the holes, I have no objection to your taking them. But unless you do remove them, I will consider that they belong to me, and will deal with them accordingly.

"It is unfortunate that a community has reached such a low ebb that a man who wants his farm fenced and cross-fenced is required to compel division fences to be built and is required to resort to a lawsuit with an adjoining property owner in order to get a proper fence built. It is little wonder that your son, who possesses the type of mentality that he does, would go into Court and commit perjury simply because a man has tried to get a decent fence. But may I say in conclusion that I am not going to stand for any more insults, and unless this fence is removed and put where it belongs under our contract, I will use every remedy at my command.

"Signed, W. A. Brookshire."

As the letter reflects, there had been considerable bickering by Brookshire about a division fence. Some of his livestock had at times gone onto the land of Mrs. Hall.

Hall managed his mother's farm and lived in one of the houses upon it, and, as stated, Brookshire lived on his farm. A Mrs. Brown, his secretary, also lived there. At one time he had a family of displaced persons living in part of the house. They had been placed there through the efforts of the Catholic church. They were dissatisfied and talked to Mr. Hall who had been friendly with them. One night they met with the local priest named Flood at Hall's home and through an interpreter told Hall and the priest that they were not contented where they were. Hall had testified in the magistrate court that they told Rev. Flood

through an interpreter that Brookshire locked them in their rooms at night, and in the present suit Brookshire assigns this as a false and consequently perjured statement. Rev. Flood testified in the present trial that he did not recall their saying that they were locked in their rooms "with a lock". He said that they stated that they felt like they were in a concentration camp.

The plaintiff called twelve neighbors of Brookshire to testify about his reputation and all of them stated that it was bad. The court limited the plaintiff to this number of witnesses. Plaintiff also put on Brookshire to prove his financial worth.

Brookshire and Mrs. Brown testified that Brookshire had treated the displaced persons well and that Hall had been an interfering troublesome neighbor. Brookshire put in evidence the testimony of four men from St. Francois County where he had formerly lived, who testified that his reputation in the county where he had formerly lived was good. There was a maze of other testimony not relevant to the issues and consequently it need not be set out.

■ It is first contended that the defendant's reputation was not in issue and that the court erred in admitting evidence in relation to it. The same point was raised on the first appeal in this case. The Supreme Court held that such evidence was admissible to establish the truth or the falsity of the testimony of Hall before the magistrate, which testimony gave rise to the charge that Hall had perjured himself. Hall v. Brookshire, Mo.Sup., 267 S.W.2d 627.

■ ■ It is also urged that since the plaintiff called the defendant as a witness he was bound by the defendant's testimony. The appellant apparently urges us to hold that by calling him as a witness the plaintiff vouched for his character and was bound by his testimony. This is not the rule and plaintiff had the right to introduce evidence contradicting that of the defendant even though the plaintiff called the defendant as a witness. Section 491.030 RSMo 1949, V.A. M.S., provides that a party to any civil action may call the adverse party as a witness and examine him under the rules applicable to cross-examination. The plaintiff called Brookshire to the stand to examine him about his financial worth and thereafter the witness propounded questions to himself and testified at length on all phases of the case. What he said in his own behalf did not in any way bind the plaintiff. Where a party desires to prove an essential element of his case by his opponent, he is permitted to do so, and he is only bound by that part of his adversary's testimony for which he vouches for as the truth and he is free to show facts contradictory of all other testimony given by the adverse party. Lolordo v. Lacy, 337 Mo. 1097, 88 S.W.2d 353, loc. cit. 355; Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 141 A.L.R. 1; Missouri Cafeteria v. McVey, 362 Mo. 583, 242 S.W. 2d 549.

■ It is next contended that the court erred in admitting the testimony of the priest named John P. Flood as to what was said by the displaced persons on the night he was with them at Hall's home. What was said by these people was made an issue in the case by the defendant charging in his answer that Hall perjured himself by testifying in the magistrate court that the displaced persons told Flood that they were locked in their rooms at night. Since he made this conversation an issue, he cannot now complain that it is hearsay.

■ Defendant also finds fault with instructions Nos. 8 and 9, which had to do with the burden of proof. No question is raised as to the form of the instructions but the appellant asserts that it was erroneous to place the burden of proving the truthfulness of his charge of perjury upon him. He states that the plaintiff by his own evidence sought to prove the falsity of Brookshire's charge of perjury and thereby assumed the burden of proof. The assertion is quite fallacious. The burden of proving the affirmative defense that the defamatory statement was true was upon the defendant. The truth or falsity of the words were in issue and the plaintiff could, of course, produce evidence to show them false. In addition to this, the petition charges malice and

the falsity of the defamation may always be shown to prove the malice charged. Warren v. Pulitzer Pub. Co., 336 Mo. 184, 78 S.W.2d 404; Conrad v. Allis-Chalmers Mfg. Co., 228 Mo.App. 817, 73 S.W.2d 438.

■ Defendant next states that instruction No. 2 given at the request of the plaintiff is in conflict with instruction No. 4 given at the request of the defendant. The first instruction merely states that if the defendant wrote a letter to Mrs. Bessie B. Hall in which he said, "It is little wonder that your son, who possesses the type of mentality that he does, would go into Court and commit perjury simply because a man has tried to get a decent fence", and continues with other required findings, but the complaint made here goes only to the quoted portion. It is said that it is in conflict with instruction No. 4, which tells the jury that they must consider the letter as a whole and not merely a part thereof. There is no conflict between these two instructions as the first in no way limits the jury to a consideration of the quoted portion of the letter.

■ It is also asserted that the instruction is erroneous in requiring a finding that the words tended to provoke the plaintiff to wrath in that there is no evidence to support this. The evidence of the plaintiff was that he was "humiliated", "embarrassed", and "mortified" by the letter. No exposition of the subject is required to show that words which bring about humiliation and embarrassment tend to provoke wrath, and the point is without merit.

■ Another instruction with which the defendant finds fault is designated P–7 and has to do with punitive damages. It is stated that the instruction assumes actual damages but it does not. There was a separate instruction on actual damages and the instruction on punitive damages states that if the jury finds actual damages in accordance with the other instruction they may assess punitive damages and continues on that subject.

■ Certain instructions offered by the defendant were refused and one of these

has to do with the meaning of the words "would go into Court and commit perjury". It is contended that these words were meant to convey the meaning that a future act would be committed and that they were so understood by Mrs. Hall. Mrs. Hall knew that her son had testified in the magistrate court and when the full phrase, "It is little wonder that your son * * * would go into Court and commit perjury" is read, it conveys only one meaning and that is that he had done so. The word "would" not only connotes future action but also a customary or habitual action. Webster's New International Dictionary, Second Edition (Merriam-Webster). All this, however, is set at rest by the pleadings in which the defendant admits that he wrote and mailed the letter and places his defense on the averment that the plaintiff did in fact commit the perjury charged. As stated in the first appeal, Hall v. Brookshire, Mo.Sup., 267 S.W.2d 627, loc. cit. 630: "Defendant will not be permitted to blow both hot and cold, and in the face of the above allegation of his answer assert in his brief that in the alleged libel in the letter to plaintiff's mother defendant meant only that plaintiff would commit perjury in the future."

■ Defendant's instructions Nos. 10 and 11 were properly refused because they were not supported by the evidence. Instruction D–12 was properly refused because it was repetitious of instructions D–1 and D–2 given by the court.

The defendant also offered an instruction designated D–7, which was refused by the court. It is as follows:

"You are instructed that a man first assailed by libelous or slanderous words and statements has a right to defend himself. Therefore, if you find and believe that the plaintiff assaulted the reputation and character of the defendant by testifying in Court, or by oral statements, to the plaintiff's mother, or other persons, prior to the times that the defendant wrote the letters complained of, then the defendant is excused under the law of self defense in writing the letters and your verdict should be for the defendant."

The rule upon which the defendant relies in support of this offered instruction is stated in 33 Am.Jur., Sec. 135, p. 134, and is as follows:

> "Statements Made in Course of Controversy.—While some courts, proceeding on the theory that one defamation cannot be set off against another, hold that no privilege attaches to a libel or a slander merely because it may have been provoked by a prior publication of objectionable character, others take the view that a defamatory communication made in the course of a mutual controversy is qualifiedly privileged if it bears a reasonable relationship to the original aggression."

The rule is further elaborated upon in 53 C.J.S., Libel and Slander, § 136, p. 222, which states:

> "Self-defense cannot be invoked to excuse a libel which is not on its face a retort, and which makes no reference to any occasion or need of self defense."

The cases in support of the quoted texts deal largely with newspaper publications, and are predicated upon the theory that one who starts a newspaper war may not subsequently complain that he has had the worst of the fray. The authorities hold that remote acts will not justify libel and a retort to be excusable must, as stated in Corpus Juris Secundum, be responsive to the statement against which it defends. The instruction offered goes beyond this and seeks to justify the defendant in calling the plaintiff a perjurer if it was in retort to statements made "to his mother and other persons". Thus, regardless of whether or not defendant might have cried perjury when his reputation was assailed in court, the charge of perjury was certainly not in retort to statements made by the plaintiff to his mother and other persons. Section 509.210 RSMo 1949, V.A.M.S., provides that mitigating circumstances may be pleaded by the defendant in a libel suit, but this does not mean that they may be pleaded in defense of it but only in mitigation.

The instruction does not seek to do this, and for this and the other reason stated it was not erroneously refused. Israel v. Israel, 109 Mo.App. 366, 84 S.W. 453; Miller v. Dorsey, 149 Mo.App. 24, 129 S.W. 66; Foster v. Aubuchon, Mo.App., 221 S.W. 741.

It is also asserted that plaintiff failed to make a case properly submissible to the jury, but this was disposed of by the decision on the prior appeal where the court found the point without merit.

Another point raised has to do with what the defendant described as the erroneous interference by the court with the deliberation of the jury. The defendant put on evidence that after the jury had been in deliberation about an hour and twenty minutes the judge instructed the deputy sheriff in charge of them to ask if they were about to arrive at a verdict. The sheriff did this and was informed by the foreman that they were not experiencing any special difficulty and that he thought they would reach a verdict in about thirty minutes. How this could be construed as interference with the jury's deliberation is not elaborated upon and the point obviously merits no consideration.

The last remaining point raised relates to the argument of plaintiff's counsel. It is contended that the argument was inflammatory, prejudicial, unethical and untrue. The transcript contains only extracts from Mr. Orr's argument which the defendant claims were prejudicial. After argument of the case here the defendant moved to amend the transcript by filing an additional transcript of the full argument. This additional transcript that he sought to file shows that near the outset of the oratory of which the defendant complains learned counsel for the plaintiff stated:

> "You may remember when Christ was preaching the gospel, in the Holy Roman Empire that Julius Caesar was Emperor of Rome. As Christ was making his way toward Rome, the Mennonites and the Philistines stopped him in the road and they sought to en-

trap him. They asked Christ: 'Shall we continue to pay tribute unto Caesar?' And you will remember, in the Book of St. Matthew it is written that Christ said: 'Render ye unto Caesar the things that are Caesar's and unto God the things that are God's."

The Holy Roman Empire did not come into existence until about 800 years after Christ. Julius Caesar, who was never Emperor of Rome, was dead before Christ was born. Christ was never on His way to Rome and the Philistines had disappeared from Palestine before the birth of Christ. The Mennonites are a devout Protestant sect that arose in the Sixteenth Century A. D. This phrase is noteworthy only because of the ease with which the speaker crowded into one short paragraph such an abundance of misinformation. It is not, however, even pendulously attached to the argument following, which deals with taking from Brookshire and rendering unto Hall.

█ This court denied the motion to amend the transcript and where, as here, only isolated parts of the argument are preserved and it is claimed that they are in reply to the defendant's argument which is not before us, we cannot say that the statements complained of were erroneously permitted to be made. De Winter v. Lashley, Mo.App., 274 S.W.2d 40; Wapelhorst v. Lindner, Mo.Sup., 269 S.W.2d 865.

For the reasons stated, it appears that the judgment of the trial court should be affirmed and your Commissioner so recommends.

PER CURIAM.

The foregoing opinion of WOLFE, C., is adopted as the opinion of the court.

The judgment of the circuit court is accordingly affirmed.

ANDERSON, P. J., MATTHES, J., and NOAH WEINSTEIN, Special Judge, concur.